UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Niels LAUERSEN, Defendant–
Appellant–Cross–Appellee.

Docket Nos. 01–1526L, 01–1600XAP.

United States Court of Appeals,
Second Circuit.

Argued: June 16, 2003.

Decided: Sept. 15, 2003.

As Amended: Nov. 25, 2003.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Daniela Klare Elliott, Dershowitz, Eiger & Adelson, P.C., New York, N.Y.; Paul Schectman, Stillman & Friedman, P.C., New York, N.Y., on the brief), for Defendant–Appellant–Cross–Appellee.

Christine H. Chung, Asst. U.S. Atty., New York, N.Y. (James B. Comey, U.S. Atty., James G. Cavoli, Asst. U.S. Atty., New York, N.Y., on the brief), for Appellee–Cross–Appellant.

Before: NEWMAN, WINTER, and B.D. PARKER, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal primarily concerns issues of judicial disqualification and sentencing. The disqualification issue arises because the trial judge owns stock in an insurance company that was among the victims of the defendant's fraud offense. The sentencing issue arises because an enhancement, claimed by the Government on its cross-appeal to apply, somewhat overlaps with another applicable enhancement, and that overlap might justify a downward departure. Niels Lauersen appeals from the October 17, 2001, judgment of the District Court for the Southern District of New York (William H. Pauley III, District Judge), and the Government cross-appeals. We conclude that disqualification was not required. With respect to the sentence, we conclude that the enhancement sought by the Government for affecting a financial institution and deriving more than $1,000,000 in gross receipts from the offense, *see* U.S.S.G. § 2F1.1(b)(8)(B) (2000), should have been applied, but that the application of this enhancement will create a basis for consideration of a downward departure. We therefore affirm the conviction and remand for resentencing.

## Background

In August 2000, a twenty-two count indictment[1] was filed in the Southern District of New York against Niels Lauersen and Magda Binion.[2] The indictment charged Lauersen with mail fraud, 18 U.S.C. § 1341, health care fraud, 18 U.S.C. § 1347, making false statements relating to health care matters, 18 U.S.C. § 1035(a), conspiracy, 18 U.S.C. § 371, and witness tampering, 18 U.S.C. § 1512(b). Trial commenced on November 13, 2000, and ended January 9, 2001.

*The trial evidence.* The evidence established that between 1987 and 1995, Lauersen, a prominent New York City obstetrician/gynecologist, fraudulently obtained reimbursement from insurance companies for hundreds of fertility treatments he performed on patients whose insurance did not cover such treatments. Lauersen obtained reimbursement by misrepresenting to insurance companies the nature of the procedures he performed. Lauersen conspired with two anesthesiologists who assisted him, Magda Binion and Neil Ratner, to make sure that insurance claim forms they submitted would also misrepresent the nature of the fertility treatments.

---

1. A prior indictment was filed in 1998. Following a trial in 2000, a mistrial was declared after the jury failed to return a verdict.

2. Although the caption on Lauersen's briefs indicates that Magda Binion is participating in this appeal, we have no briefs from her, and the Government's brief states that only Lauersen is pursuing an appeal.

Louise Weidel, an employee of Lauersen's, prepared embryology reports between 1995 and 1997 concerning fertility treatments that Lauersen performed. A comparison of these reports with insurance claims and operation reports prepared by Lauersen between 1995 and 1997 revealed 221 surgeries that Weidel recorded as fertility treatments but that Lauersen billed as some other procedure. Weidel testified that she was aware that Lauersen was misrepresenting the nature of fertility procedures in operation reports and insurance claims, and that Lauersen did so only when fertility treatments were not covered by a patient's insurance plan.

Lisette Gonzalez, a secretary who worked in Lauersen's office, testified that Lauersen routinely supported his false insurance claims by ordering her to prepare correspondence and back-dated "office notes" that would give the appearance that patients had suffered gynecological emergencies around the time that Lauersen had actually performed fertility procedures on them. Gonzalez identified letters she had typed at Lauersen's request describing such "emergencies" and his treatment of them; Weidel's records confirmed that the patients named in these letters had in fact received fertility treatments.

Nine of Lauersen's former patients testified. The patients were shown the insurance claim forms filed by Lauersen on their behalf. In each instance, the claim form represented that on certain dates Lauersen had performed covered, non-fertility treatments on the patient; the patient testified that the procedures performed by Lauersen on those dates were in fact fertility procedures. In each instance, the patient's testimony was corroborated by Weidel's embryology reports. Two patients testified that they were aware that Lauersen misrepresented to their insurance companies the nature of the procedures he had performed on them. Two of the patients testified that after they received grand jury subpoenas, Lauersen instructed them to lie to the grand jury about the pre-treatment symptoms they had experienced and the nature of the treatment they had received; both patients refused to comply.

The facts concerning other items of evidence and the disqualification challenge are set forth below in the discussion of the recusal and evidentiary issues.

The jury found Lauersen guilty on all counts that named him.

*Sentencing.* Applying the November 1, 2000, Sentencing Guidelines Manual, the Presentence Report ("PSR") calculated that Lauersen should be sentenced at an offense level of 33, which included upward adjustments of thirteen levels, pursuant to U.S.S.G. § 2F1.1(b)(1)(N), for an intended loss of $4.9 million; two levels, pursuant to U.S.S.G. § 3B1.3, because Lauersen abused the trust of the victim insurance companies; and four levels, pursuant to U.S.S.G. § 2F1.1(b)(8)(B), because Lauersen's offense "affected a financial institution" and he received more than $1 million in gross receipts. At an offense level of 33, with a Criminal History Category of I, Lauersen's Guidelines range would have been 135 to 168 months' imprisonment. The PSR also recommended restitution in the amount of $3,274,606.

On October 15, 2001, Lauersen was sentenced. The Defendant objected to the proposed offense level adjustments for intended loss, abuse of trust, and "affecting a financial institution," and to the proposed amount of restitution. The District Court reduced the Probation Department's proposed loss and restitution figures slightly, finding an intended loss of $4,890,578 and ordering restitution in the amount of $3,240,597. The intended loss figure accepted by the Court remained within the

range of the thirteen-level adjustment recommended in the PSR. The Court found that a two-level adjustment for abuse of trust was appropriate. The Court decided not to apply the recommended four-level enhancement for offense conduct affecting a financial institution because the Court ruled that insurance companies are not "financial institutions" for the purpose of U.S.S.G. § 2F1.1(b)(8)(B). Because the Court declined to apply this last adjustment, Lauersen's total offense level was calculated to be 29, which produced a sentencing range of 87 to 108 months. The Court sentenced Lauersen principally to 87 months' imprisonment.

### Discussion

### I. Recusal

*The facts.* The circumstances concerning the recusal issue are as follows. On June 6, prior to sentencing, Judge Pauley stated that he had determined that he "own[ed] a financial interest in at least one of the entities that is eligible for restitution" and that "as a matter of prudence, this Court may be required to disqualify itself" under 28 U.S.C. § 455(a). At a conference on June 12, Judge Pauley explained that, upon reviewing the PSR, he learned for the first time that the Equitable Insurance Company ("Equitable") was one of the companies Lauersen had defrauded and was thus eligible for restitution. Judge Pauley disclosed that he and his wife owned 400 shares in AXA Financial ("AXA"), the company to which Equitable had distributed its shares after demutualizing in 1992. Judge Pauley also disclosed that his wife held an annuity worth between $50,000 and $100,000 with Prudential Insurance Company, which had been acquired by an entity entitled to restitution, and that his wife had owned shares of AT & T, a company entitled to restitution, but had divested herself of those shares in 1999.

■ Judge Pauley stated that his wife's annuity and prior shareholding did not constitute grounds for disqualification,[3] but that the AXA shares created an appearance of impropriety requiring disqualification under section 455(a). He directed the parties to "consider the matter and submit any motions for disqualification," and further announced that he intended to disqualify himself unless all parties waived objection to his continued participation. *See Code of Conduct for United States Judges,* Canon 3D (authorizing remittal of disqualification where impartiality might reasonably be questioned), *reprinted in* II *Guide to Judiciary Policies and Procedures: Codes of Conduct for Judges and Judicial Employees* I–7 (2003) (*"Guide to Codes of Conduct"*). He announced that he would use the remittal procedure recommended by the Judicial Conference of the United States, which states that party responses are "not shown to the judge" in the event of a non-unanimous result.[4] The Judge instructed the parties to submit to the Clerk of the Court letters indicating

---

3. Although the Appellant's brief refers to the Judge's wife's annuity and her prior ownership of AT & T stock, Brief for Appellant at 17–18 & n. 12, the brief makes no explicit contention that these circumstances required recusal, though it obliquely suggests that they "contributed to the appearance of impropriety." *Id.* at 18 n. 12. The suggestion is without merit. Status as an annuitant, even if the annuity is payable by a party, is not a basis for recusal, *Maier v. Orr,* 758 F.2d 1578, 1582 (Fed.Cir.1985), nor is the wife's previous ownership of shares that were sold before either of the Appellant's trials.

4. The remittal procedure is set forth in a "NOTICE CONCERNING WAIVER OF JUDICIAL DISQUALIFICATION," approved by the Judicial Conference in September 1985. *See Guide to Codes of Conduct,* Commentary to Canon 3, at I–10.

whether each would object or waive objection to his continued participation.

The parties submitted their responses to the Clerk of the Court, and the result was not unanimous. At a hearing on July 10, 2001, the Government requested permission to brief its argument that Judge Pauley's connection with the AXA shares did not require disqualification; the defense objected on the ground that the waiver process had been completed and that any further argument on the matter would threaten to reveal the positions taken by the parties regarding waiver of disqualification. Judge Pauley obliquely suggested that recusal might not be necessary if the Government declined to pursue restitution on behalf of AXA, but later stated that

> further briefing or discussion on the issue would merely spawn more litigation in this matter, and because I cannot in a timely fashion divest myself of AXA Financial, I believe that I am compelled to recuse myself based on the finding under 455(a) .... I think that the best course is for the matter to be swiftly reassigned to another judge and I will take the appropriate steps tomorrow morning to start that process.

On July 11, the Government moved for reconsideration of Judge Pauley's decision to recuse. The Government argued that Judge Pauley was mistaken in concluding that a financial interest in a non-party victim must result in his disqualification absent unanimous waiver. On July 17, the Government submitted a letter in support of its motion for reconsideration, informing the Court that the Government had decided, in consultation with AXA, to withdraw any claim for restitution on behalf of AXA. In an Order entered July 30, 2001, the Court stated that, conditional on the filing

of certain further representations to the effect that restitution would not be sought on behalf of AXA, "recusal is not required," and further stated that the Court's decision was "based entirely on the changed circumstances reflected in the Government's July 17, 2001, letter."

■ *Section 455(a).* Section 455(a) of Title 28 provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Disqualification under section 455(a) requires a showing that would cause "an objective, disinterested observer fully informed of the underlying facts [to] entertain significant doubt that justice would be done absent recusal." *In re Aguinda,* 241 F.3d 194, 201 (2d Cir.2001) (citation and internal quotation marks omitted) (alteration in original); *see Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 858–62, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *United States v. Bayless,* 201 F.3d 116, 127–28 (2d Cir.2000). This section is the sole basis for the Appellant's challenge to Judge Pauley's participation in the pending case. No claim is made that the Judge should have recused himself pursuant to section 455(b)(4) of Title 28, which requires disqualification if a judge or certain family members have a "financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). Thus, the Appellant makes no claim that Judge Pauley had "a financial interest in the subject matter in controversy," [5] or that a victim of a criminal fraud is a "party" in the criminal case within the meaning of section 455(b).

---

**5.** Judge Pauley had an interest in AXA, not in the $13,000 that AXA might have received as restitution. *See United States v. Nobel,* 696

F.2d 231, 235–36 (3d Cir.1982) (judge owning shares in crime victim does not have interest in "the subject matter in controversy").

The Appellant advances several arguments as to why Judge Pauley was required to recuse himself under section 455(a). We consider each contention.

■ *Ownership of AXA shares.* The Appellant's principal contention is that Judge Pauley's impartiality could reasonably be questioned because of his and his wife's ownership of 400 shares of AXA Financial, one of the many insurers with a claim for restitution as a result of the Appellant's fraud. We have ruled, applying a prior version of section 455, that ownership of a small amount of the stock of the victim of a crime (bank robbery) did not disqualify a judge from presiding at the criminal trial. *United States v. Ravich,* 421 F.2d 1196, 1205 (2d Cir.1970) (Friendly, J.).[6] In that case, the judge's shares amounted to .0072 percent of the outstanding shares of the victim bank. Although section 455 at that time required recusal if a judge had a "substantial interest" in the case, Judge Friendly observed that the judge's interest "was not merely unsubstantial but nonexistent." In the pending case, Judge Pauley's and his wife's shares of AXA represent .00009 percent of the victim insurer's stock. That slight interest, even less significant than the interest termed "nonexistent" in *Ravich,* would not cause an objective observer to question Judge Pauley's impartiality, once that observer became aware that AXA, a company worth $5.8 billion, had a restitution claim for only $13,046.

After section 455 was amended to require recusal when a judge's impartiality could reasonably be questioned, two circuits ruled that ownership of a small percentage of shares of a crime victim did not meet the section 455(a) standard for recusal. *United States v. Rogers,* 119 F.3d 1377, 1384 (9th Cir.1997) (judge was one of millions of shareholders of defrauded bank); *United States v. Sellers,* 566 F.2d 884, 887 (4th Cir.1977) (judge and family owned less than .04 percent of stock of robbed bank); *see United States v. Nobel,* 696 F.2d 231, 235–36 (3d Cir.1982) (recusal required where judge had "substantial" interest in crime victim).

We recognize that the Judicial Conference's Advisory Committee on Codes of Conduct has informally advised that, at least in some circumstances, a judge should recuse if the judge or the judge's spouse owns stock in a crime victim who may be entitled to restitution. That advice is briefly noted in a compendium of summaries of informal confidential opinions given by the Committee in response to judicial inquiries. *See Guide to Codes of Conduct,* Ch. 5, Compendium of Selected Opinions ("Compendium"), § 3.1–6[7].[7]

---

**6.** The version of section 455 applicable when *Ravich* was decided required that a judge "disqualify himself in any case in which he has a substantial interest." 28 U.S.C. § 455 (1970).

**7.** The Compendium collects only summaries of the informal, unpublished opinions issued by the Advisory Committee. The Committee also issues formal, published opinions, stating all the pertinent circumstances submitted by the judge who sought the Committee's opinion and providing the Committee's rationale for its advice.

At oral argument of this appeal, when counsel for the Appellant was asked, "You can't obtain the published opinion of the Committee o[n] the Codes of Conduct?" he replied, "We are told that the Committee—the texts of the opinions are available only to judges and not to the general public." (Transcript supplied by letter from Appellant's counsel, Sept. 26, 2003). In fact the *published* opinions are contained in volume II of the *Guide to Judiciary Policies and Procedures: Codes of Conduct for Judges and Judicial Employees* ("*Guide to Codes of Conduct*"), and we are advised by the Office of the General Counsel of the Administrative Office of the United States Courts ("AO") that the *Guide to Codes of Conduct,* though not available online, is not a confidential document and is available in

Judge Pauley referred to the advice in the Compendium in making his initial decision to recuse.

We have considered the view of the Advisory Committee and believe it should not be taken as suggesting that recusal is required under section 455(a) in every criminal case where a judge has an interest in a crime victim entitled to restitution. *See In re National Union Fire Insurance Co. of Pittsburgh, Pennsylvania,* 839 F.2d 1226, 1231 (7th Cir.1988) (declining to agree with Advisory Committee's informal opinion interpreting remittal of disqualification provision of Canon 3D). First, the Advisory Committee acknowledges that it does not purport to construe the disqualification statutes, but advises only with respect to the Code of Conduct. *See Guide to Codes of Conduct* at IV–125 (Advisory Opinion No. 57). Second, as we have noted, courts construing section 455(a) have ruled that a judge who has an interest in a crime victim need not recuse unless that interest is substantial. Third, section 455 and the Code both provide that *any* interest in a *party* requires recusal. 28 U.S.C. § 455(b)(4); *Guide to Codes of Conduct* at I–6, Canon 3(C)(1)(c). This rejection of a *de minimis* approach to stock ownership of a party suggests that an insubstantial interest in a non-party, even one with some relationship to the case, is not an automatic basis for recusal. *See Liljeberg,*

486 U.S. at 860 n. 8, 108 S.Ct. 2194 (" § 455(b)(4) requires disqualification no matter how insubstantial the financial interest and regardless of whether or not the interest actually creates an appearance of impropriety."); *cf. National Union,* 839 F.2d at 1229 ("The care with which [the provisions of section 455(b)(5) ] are drafted should make a court hesitate to treat the general language of § 455(a) [concerning disqualifying family relationships] as a bar to judicial service whenever a relative has 'something to do with' a party . . . ."). Finally, we note that, because the advice in the Compendium contains only a summary of a confidential response to a judge's inquiry and not the full text of a published opinion by the Advisory Committee, the Compendium does not disclose the details of either the inquiring judge's stock ownership or any other facts that would bear on the substantiality of the judge's interest in relation to the facts of the case.

For all of these reasons, we decline to adopt a *per se* rule requiring recusal in every instance where a judge has an interest in the victim of a crime. Instead, we believe that recusal is required only where the extent of the judge's interest in the crime victim is so substantial, or the amount that the victim might recover as restitution is so substantial, that an objec-

---

many libraries. The library of the Harvard Law School advises that it has a copy.

Appellate counsel's Sept. 26 letter includes the affidavit of an associate reporting that she endeavored to obtain a copy of the Compendium "so that [counsel] could review Judge Pauley's quotation to it." The letter asserts that the edition of the Compendium cited by Judge Pauley—the 2001 edition—is not available at the Harvard Law Library. However, the letter includes a letter from the Library stating that, although the Library does not have supplements to the *Guide to Codes of Conduct* issued after November 2000, its copy is up to date through transmittal No. 16,

issued in November 2000. The AO advises that the passage from the Compendium quoted by Judge Pauley was included in transmittal No. 11, issued in May 1997. The Harvard Law Library confirms that Judge Pauley's quotation from the Compendium is included in the library's copy of the *Guide to Codes of Conduct.*

If counsel was endeavoring to assert the unavailability of the unpublished opinion underlying the summary in the Compendium quoted by Judge Pauley, that document is not available to the public or to judges generally, but only to the judge who submitted an inquiry to the Committee on Codes of Conduct.

tive observer would have a reasonable basis to doubt the judge's impartiality. Neither Judge Pauley's minuscule holding of AXA shares nor the $13,046 that this large company was originally entitled to claim as restitution meet that standard.[8]

■ *AXA's waiver of its restitution claim.* Ultimately Judge Pauley decided not to recuse because AXA informed the Government that it would waive any claim for restitution. The Appellant contends that relinquishment of a claim for restitution cannot remove an otherwise existing basis for recusal. The Appellant points out that subsection 455(f) explicitly creates an opportunity for a judge owning stock of a party to avoid recusal by selling the stock in circumstances where the judge was previously unaware of the stock ownership at the start of the litigation,[9] and had already devoted substantial time to the litigation. 28 U.S.C. § 455(f); *see Guide to Codes of Conduct* at I–7, Canon 3(C)(4) (parallel provision to subsection 455(f)). In the Appellant's view, section 455(f) carries a negative implication that no other technique can eliminate an otherwise disqualifying circumstance. We disagree.

Section 455(f) provides an explicit means of eliminating the basis for recusal other-wise required by the strict requirement of section 455(b)(4). There is no reason to read into subsection 455(f) a negative implication that precludes elimination of a circumstance that could require disqualification under the more general "appearance of partiality" standard of subsection 455(a). We have previously approved a judge's elimination of a possible basis for a section 455(a) recusal by selling stocks that made the judge a putative member of a plaintiff class. *In re Certain Underwriter,* 294 F.3d 297, 306 (2d Cir.2002); *see S.J. Groves & Sons Co. v. International Brotherhood of Teamsters,* 581 F.2d 1241, 1246–48 (7th Cir.1978) (basis for section 455(a) recusal because judge's brother was senior partner of firm representing plaintiffs eliminated by withdrawal of brother's firm). Moreover, the Advisory Committee, in its Compendium, has twice endorsed elimination of a basis for recusal under circumstances not covered by subsection 455(f). One judge was advised that he could avoid recusal because of stock ownership in a party in a class action by electing to opt out of the class. Compendium § 3.1–6[4](c), (e). Another judge, who was concerned about recusal because of the connection of a law clerk to the case, was advised that recusal could be avoided

---

8. The Appellant endeavors to support his arguments for recusal of Judge Pauley by pointing out that the judges of this Court previously assigned to hear this appeal recused. As those judges stated in an order filed May 13, 2003, "The members of the panel ... having reviewed the victim list in the Presentence Report, have determined that they are confronted with an analogous issue." *United States v. Lauersen,* Amended Order (2d Cir. May 13, 2003). However, their reason for recusal does not support the argument for Judge Pauley's recusal. The issue for him was whether his stock ownership in a crime victim created a reasonable basis for questioning his impartiality to proceed with the case. The issue for the prior panel members was whether their stock ownership in a crime victim created a reasonable basis for questioning their impartiality to decide the issue of whether a trial judge's stock ownership in a crime victim creates a ground for recusal under section 455(a). Had they not recused because of their stock ownership, an observer could have reasonably concluded that they had prejudged the issue of whether Judge Pauley should have recused. As the appellate judges stated, "The panel has concluded that ... *to review the actions* of the district judge could raise questions about the appearance of the absence of impartiality." *Id.* (emphasis added).

9. One obvious example would arise if a judge inherited the stock during the litigation.

by isolating the law clerk from any work on the case. *Id.* § 3.5.

Even if Judge Pauley's ownership of AXA shares had provided a basis for recusal, we see no valid reason why AXA's decision to forgo its restitution claim would not have sufficed to eliminate such a basis.

■ *Reconsideration of recusal.* The Appellant contends that, once Judge Pauley decided to recuse, he could not reconsider his decision, even if that decision was not initially required. In effect, the Appellant views the Judge's initial decision as an irrevocable relinquishment of jurisdiction. As a general matter, any interlocutory ruling can be reconsidered prior to the entry of a final judgment. Fed.R.Civ.P. 54(b). Even a ruling that a judge lacks subject matter jurisdiction can be reconsidered and revised. *See, e.g., Walsh v. McGee,* 918 F.Supp. 107, 113 (S.D.N.Y.1996). There is no reason to prohibit a judge from reconsidering a recusal decision, at least in the absence of transfer of the case to another judge. *See United States v. Dalfonso,* 707 F.2d 757, 759 (3d Cir.1983) (judge announced decision to recuse and subsequently vacated recusal order). *But see Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 456–58 (5th Cir.1996); *El Fenix de Puerto Rico v. M/Y JOHANNY,* 36 F.3d 136, 141–42 (1st Cir.1994).

An example will demonstrate the lack of merit in the Appellant's contention. Consider a judge who announces that he will recuse because his wife owns stock in one of the parties. Later that day his wife informs him that she sold that stock months ago. No one could seriously maintain that the judge could not reconsider and revise his initial decision to recuse. We note that the Compendium explicitly approves a judge reversing the judge's recusal decision "if it becomes apparent that recusal was unnecessary and should not have occurred." Compendium, § 3.8–2[1](b).

■ *The remittal procedure.* The Appellant contends that, whether or not Judge Pauley was obliged to recuse because of the AXA shares, his recusal was required because the anonymity contemplated by the remittal procedure was not preserved. To implement the remittal of disqualification procedure authorized by Canon 3D, the Advisory Committee has recommended a remittal procedure and provided a form of notice, approved by the Judicial Conference of the United States. *See Guide to Codes of Conduct* I–10 (NOTICE CONCERNING WAIVER OF JUDICIAL DISQUALIFICATION). The recommended procedure contemplates that the judge will inform the parties of the circumstances that require recusal under section 455(a) and advise each party to inform the Clerk whether or not there is objection to the judge's continued participation. In the event that all parties express no objection, the basis for recusal is said to be "remitted." If any party objects, the judge recuses. The Clerk is instructed not to inform the judge of the identity of the objecting party. *Id.; see Hardy v. United States,* 878 F.2d 94, 98 n. 5 (2d Cir.1989) (describing remittal procedure).

In the pending case, Judge Pauley initiated the remittal procedure but became aware that the Appellant had not agreed to his continued participation.[10] We see no reason why this circumstance should entitle the Appellant to any relief. The procedure for maintaining anonymity of the objecting party during the remittal process is

---

10. The Government contends that the Appellant acquiesced in the procedure that apprised Judge Pauley of the Appellant's refusal to waive disqualification. We find it unnecessary to assess this claim.

not required by statute, rule, or even the Code of Conduct for United States Judges, but is simply a recommendation of the Advisory Committee. Furthermore, although non-disclosure of the identity of the objecting party is preferable, that party has no enforceable entitlement to anonymity. It has never been suggested that a party who unsuccessfully moves to disqualify a judge has any basis to require recusal simply because the judge is aware that the party sought his recusal. *See Hardy*, 878 F.2d at 98 (formal motion normally required to preserve disqualification claim "despite the discomfort counsel may feel in making it"). Although disclosure of the identity of a party moving for disqualification is unavoidable whereas the remittal procedure contemplated by the Advisory Committee can preserve the anonymity of a party declining to remit the disqualification, we do not believe that identification of the objecting party itself creates a basis for reasonably questioning the judge's impartiality or otherwise precludes the judge's continued service.

Finally, we note that in the typical situation where remittal is sought and one party objects, the judge will recuse; non-disclosure of the objecting party is recommended, not to protect the objecting party in the case from which the judge recused, but in future cases where that party might appear before the same judge and might, perhaps unreasonably, apprehend hostility from the judge. In the pending case, the Judge reconsidered the recusal decision and properly determined not to recuse. The Judge's awareness that Appellant would not have consented to remittal, had recusal otherwise been warranted, is not a basis for any relief. *See National Union*, 839 F.2d at 1231 (rejecting Advisory Committee's view that recusal was required where judge, not required to recuse, sought "observations of counsel," learned of a party's objection, and continued to participate).

In sum, all of the Appellant's contentions concerning recusal are without merit.[11]

---

11. Even if recusal were required, it would pertain only to the sentencing phase of the case. The reason requires some elaboration.

The Supreme Court has noted that recusal under subsection 455(a) "does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Liljeberg*, 486 U.S. at 860, 108 S.Ct. 2194. In *Liljeberg*, even though the trial judge had stated that he had forgotten the transaction between the university on whose board he served and one of the parties in the litigation before him, the Court of Appeals ruled, and the Supreme Court agreed, that a reasonable observer "would expect" that the trial judge would remember the transaction. *Id.* at 852.

In the pending case, however, no reasonable basis existed for Judge Pauley to be aware that his ownership of AXA shares might create a basis for recusal until after the conclusion of the trial when he read the PSR and learned for the first time that Equitable, and therefore AXA Financial, was eligible for resti-

tution. AXA had become the successor to Equitable's interest when Equitable demutualized. Neither Equitable nor AXA was mentioned in the indictment or in any testimony at either the first or second trial. Apart from the PSR, the only reference to Equitable was in Exhibit GX 500, in which Equitable was mentioned twice among 616 entries. No reasonable observer would have expected Judge Pauley to scrutinize the names of every one of the companies listed in GX 500 and to become aware, prior to reading the PSR, that his ownership of AXA shares might create a ground for recusal.

Thus, recusal, if required at all, would have been required only with respect to proceedings after Judge Pauley became aware of Equitable's claim for restitution, and at that point only sentencing remained. However, at oral argument of this appeal, counsel for the Appellant acknowledged that, if we were to determine that the only available relief was a remand for resentencing before a different judge, the Appellant expressly disclaimed such a remedy.

## II. Evidentiary Issues

■ *Tina O'Grady's Testimony.* As part of the investigation that led to Lauersen's indictment, the FBI searched Lauersen's offices in 1997. Tina O'Grady, one of Lauersen's former patients, testified that on a visit to Lauersen's office after the FBI search she noticed that her patient file was much thinner than it had been on her previous visit. She told the nurse that the nurse had the wrong file. She testified that the nurse replied that the file was a replacement for O'Grady's original file, which along with "many others, was destroyed, anything having to do with infertility." The nurse told O'Grady that Lauersen's office "had a tip, therefore, they destroyed the files before the government agency came in to confiscate" them.

The Court admitted O'Grady's testimony recounting the nurse's statements under Fed.R.Evid. 801(d)(2)(D) (agency admissions) and possibly 801(d)(2)(E) (co-conspirator statements).[12]

The Appellant challenges O'Grady's account of the nurse's statements as beyond the scope of the hearsay exception for statements by an agent of a party-opponent concerning matters within the scope of agency or employment, Fed.R.Evid. 801(d)(2)(D). He argues that "file purging" was not within the scope of the nurse's employment. However, as the Government responds, because nurses in Lauersen's office were responsible for helping maintain patient files, the condition and content of a patient's file were subjects properly within the "scope of employment" for the purpose of this rule. The statements relate to patient files, and the nurse had "authority to take action," *Pappas v. Middle Earth Condominium Association,* 963 F.2d 534, 538 (2d Cir.

1992), regarding patient files. In any event, it was surely within the scope of the nurse's employment to assure a patient that a file being examined was the patient's and to provide an explanation to allay the patient's justifiable doubts.

The Appellant also contends that the nurse's statement was inadmissible hearsay because there was no evidence to establish that the nurse had "personal knowledge" of the substance of her statements. However, the nurse's personal knowledge was readily inferable from her statement that "we destroyed your file." In any event, we have not required personal knowledge for statements by a party's agent. *See id.* at 537.

■■ *Ratner's Testimony and Government Exhibits 70 and 500.* Ratner, testifying pursuant to a cooperation agreement with the Government, reported that in 1987 he began providing anesthesia when Lauersen performed surgery. Ratner testified that Lauersen explained to him that because fertility treatments usually were not covered by patients' insurance, he and Ratner would bill them as other types of procedures, and that Ratner's paperwork in connection with these special cases should not mention anything about the fertility treatments actually performed. Ratner testified that from 1987 to 1997, he and Lauersen billed all fertility surgeries that were not covered by insurance as covered, non-fertility gynecological services. Ratner estimated that Lauersen performed between 100 and 200 fertility surgeries a year during this period, and that 95 percent of these were not covered by insurance and thus were falsely billed.

The Government introduced three sets of Ratner's anesthesiology charts for the

---

**12.** The District Court did not make clear which hearsay exception it was relying on, but stated that the evidence was admissible under Rule 801(d)(2)(D) "more easily" than under Rule 801(d)(2)(E).

years 1987–1997: GX81, a set of records from part of 1989 maintained by Ratner at "[his] place in New York"; GX90, a set of records from 1990 to 1997 maintained by Ratner at his "home office"; and GX70, a set of records from 1989 to 1997 maintained by Warrens Transactions ("Warrens"), a record-keeping business operated by Ratner's father. Every week Ratner sent copies of his anesthesiology charts and operative reports to Warrens. He taught his father how to assemble, maintain, and file the "billing packets" that included Ratner's anesthesiology charts and reports. He visited Warrens and observed his father's work to ensure that these procedures were followed.

Ratner testified that in order to disguise in his records the true nature of the fertility procedures, he devised a code that he used for describing fertility procedures in his anesthesiology charts. Apparently relying on the set of records introduced as GX70, FBI Agent Michael Bertrand testified that he entered data from the records into a computer and searched the entered data for incidents that, applying Ratner's code, would indicate a fraudulently billed fertility treatment.[13] In this way, the Government identified 395 such procedures performed by Lauersen between 1989 and the end of 1994. A summary chart, GX500, listed 616 procedures that the Government contended were fraudulently billed; the 395 procedures identified for the period 1987 to 1994 using the analysis of Ratner's records and the 221 procedures identified for the period 1995 to 1997 using Weidel's embryology reports.

The Appellant objected to GX70, and also to GX500 because it was based in part on GX70. It is unclear what the grounds

for objection were; counsel conceded that "[t]his is not a business records objection I'm making," but a "chain of custody" objection, and appeared to rely primarily on the authentication provisions contained in Fed.R.Evid. 901 and 902. The Court admitted GX70 conditionally:

> While the government has established a sufficient foundation that [GX70] contains records of regularly conducted business activity and there's no objection to that effect, they've not established a chain of custody.... Accordingly, I'm going to admit GX70 conditionally ... with the understanding that the government is going to provide a declaration showing the chain of custody.

The Government later submitted the affirmation of FBI Special Agent Michael Porzio. Porzio affirmed that Ratner's father, Marvin Ratner, had produced the documents contained in GX70 in response to a subpoena and that the documents had been faithfully maintained during the time they were in Government custody. Following submission of this affirmation, defense counsel renewed his objection, contending that the affirmation was insufficient to satisfy the requirements of the business record exception of Fed.R.Evid. 803(6) or the authentication provisions of Fed.R.Evid. 901 or 902. The Court ruled that the Government had "made out its prima facie case" and refused to exclude the evidence.

The Appellant contends that GX70 was improperly admitted, and that GX500, the summary table based in part on GX70, should therefore also have been excluded. To the extent that the Appellant challenges the "chain of custody," we agree

---

**13.** Agent Bertrand testified that by comparing Ratner's charts for the period 1995 to 1997 with Weidel's embryology records from the same period, he determined that Ratner's

code was more than 95 percent reliable in distinguishing misrepresented fertility treatments from real non-fertility procedures.

with the Government that "chain of custody" was adequately established by Agent Porzio's declaration. As to the objection of lack of certification or testimony of a custodian or qualified person, we agree with the Government that Ratner was qualified to lay a foundation under Rule 803(6) and that the father's testimony was not required. The term "custodian or other qualified witness" in Rules 803(6) and 902(11) ("qualified person") is generally

> given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business.

5 Weinstein's Federal Evidence § 803.08[8][a], at 803–77 (2d ed.2003); *see Phoenix Associates III v. Stone*, 60 F.3d 95, 101 (2d Cir.1995). Ratner, who testified concerning the record-keeping procedures of his father's business, was sufficiently familiar with those procedures for purposes of Rule 803(6) because he personally designed them and observed them being properly implemented. Because Rule 803(6) was satisfied by Ratner's testimony, Rule 902(11) certification and notice were unnecessary. *See* 5 Weinstein's Federal Evidence, § 803.08[8][b], at 803–82 (*"Instead* of providing live testimony from a custodian or other qualified witness, the proponent of business records may choose to present the foundation by a certification that complies with Rule 902(11) ...."") (emphasis added). The billing records were produced to the Government by Warrens, and Ratner sufficiently demonstrated that Warrens maintained billing records in such a way that they could be reliably admitted as business records. Because

GX70 was admissible, GX500 was also admissible.

### III. Sentencing Issues

#### 1. Estimation of Fraud Loss

 The Appellant challenges the thirteen-level upward adjustment for an intended loss of $4.9 million, contending that GX500, which supported an even larger figure, was unreliable. The $4.9 million intended loss figure, which the Probation Office called "a ... conservative estimate," was based primarily on the amount requested by Lauersen from insurers for procedures listed on GX500. The District Court's finding that GX500 was reliable was a factual determination, entitled to considerable deference on appeal. To the extent that GX500 was compiled by reference to the code Ratner provided, a cross-check against the records of Weidel demonstrated that Ratner's code was reliable. Moreover, the estimation of intended loss derived from Ratner's testimony and other admissible evidence would have supported at least the same upward adjustment for intended loss as the Court applied.[14]

#### 2. Enhancement for Abuse of Trust

 While recognizing that the Court of Appeals has approved abuse-of-trust enhancements where physicians were convicted of overbilling insurance programs, *see United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir.1998), the Appellant argues that here there was no trust relationship to abuse because "the insurance companies reposed no trust in [Lauersen]; repeatedly questioning claims he submitted." Brief for Appellant at 74. The ar-

---

**14.** The Government submitted a sentencing memorandum in which it observed that, without relying at all on GX500, an intended loss estimate of $6.7 million could be extrapolated from the testimony of Ratner and Weidel, and an intended loss estimate of $6 million could be extrapolated from a comparison of Weidel's embryology reports with Lauersen's insurance claim forms.

gument lacks merit. The insurance companies apparently trusted Lauersen enough to reimburse him for millions of dollars in claims he submitted over the ten year period during which his fraud continued. Furthermore, if the companies began not to trust Lauersen, it was because they correctly suspected that he was abusing their trust.

### 3. Enhancement for Conduct Affecting a Financial Institution

■ The Government cross-appeals from the District Court's decision not to apply a four-level upward enhancement, pursuant to U.S.S.G. § 2F1.1(b)(8)(B). The enhancement applies if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." *Id.* The District Court concluded that insurance companies do not qualify as "financial institutions" for purposes of subsection 2F1.1(b)(8)(B).

The District Court's view of section 2F1.1(b)(8)(B) runs directly counter to the Commission's view as expressed in Application Note 19 to section 2F1.1. That note specifically lists "insurance company" among the types of institutions included within the guideline's definition of "financial institution." Since the District Court ordered restitution of more than $3 million, the Court necessarily determined that Appellant derived more than $1 million in gross receipts from the offense. The four-level enhancement required by section 2F1.1(b)(8)(B) should have been imposed.[15]

Although the sentence must be remanded for resentencing with the adjusted offense level increased from 29 to 33, that increase creates a new circumstance that might well justify a downward departure to some extent. Lauersen's offense level has already been increased 13 levels because of the large amount of money involved in his fraud. The subsection 2F1.1(b)(8)(B) enhancement will add an additional 4 levels in large part because the proceeds of the fraud exceed $1 million. This cumulation of enhancements is not impermissible double-counting because the dollar-amount enhancement of subsection 2F1.1(b)(1)(N) and the "financial institution" enhancement of subsection 2F1.1(b)(8)(B) serve different purposes. *See United States v. Campbell,* 967 F.2d

---

**15.** In rejecting the enhancement, the District Court relied on the decision of a divided panel of the Seventh Circuit in *United States v. Tomasino,* 206 F.3d 739 (7th Cir.), *reh'g denied,* 230 F.3d 1034 (7th Cir.2000), which declined to consider a pension fund to be a "financial institution" for purposes of subsection 2F1.1(b)(7)(B) (Nov. 1, 1998). The Seventh Circuit reasoned as follows. The commentary to section 2F1.1 states that subsection 2F1.1(b)(7)(B), which was renumbered as subsection 2F1.1(b)(8)(B) in the Nov. 1, 2000 Guidelines Manual, implements Congress's instruction to the Commission in section 2507 of Public Law 101–647; that section requires increased punishment for those who derive more than $1 million from fraud affecting a "financial institution" as that term is defined in 18 U.S.C. § 20; section 20 does not include a pension fund within its definition of "financial institution." The

Seventh Circuit concluded that the Commission might have included pension funds within the definition of financial institutions only because of a mistaken view that Congress instructed it to do so. Because section 20 also does not include an insurance company within its definition of "financial institution," Lauersen urges us to adopt the reasoning of *Tomasino* and conclude that the Commission might have included insurance companies because of a mistaken view that Congress instructed it to do so.

We think Judge Easterbrook's dissent in *Tomasino* properly rejects the argument, whether applied to a pension fund or an insurance company. The language of Application Note 19 is entirely clear as to the scope of subsection 2F1.1(b)(8)(B). We note, in addition, that the Commission subsequently rejected the ruling in *Tomasino. See* U.S.S.G. app. C, amend. 617, at 184 (Supp.2001).

20, 25 (2d Cir.1992) ("[D]ouble counting is legitimate where a single act is relevant to two dimensions of the Guidelines analysis."). Nevertheless, there is substantial overlap between the two enhancements; the large amount of money involved in the fraud significantly triggers both of them. And at the upper ranges of the sentencing table, the cumulative effect of enhancements has a significant effect upon the applicable sentencing range. *See United States v. Sofsky,* 287 F.3d 122. 124 n. 1 (2d Cir.2002). In Lauersen's case, the four-level enhancement from level 29, required by subsection 2F1.1(b)(8)(B), increases the minimum of his sentencing range by four years, whereas that same four-level enhancement from level 13, for example, would result in an increase in the minimum of the sentencing range of only 12 months. U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

We recognize that the Guidelines permit the use of a subsection 2F1.1(b)(8)(B) enhancement in addition to a subsection 2F1.1(b)(1)(N) enhancement. Nevertheless, we think that the cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present "to a degree" not adequately considered by the Commission, *see* 18 U.S.C. § 3553(b)(1), and therefore permits a sentencing judge to make a downward departure. *Cf. United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996) (downward departure authorized where substantially enhanced sentence range results from a series of enhancements proven only by preponderance of the evidence), *amending* 39 F.3d 42, 48 (2d Cir.1994).

Upon remand, therefore, the District Judge must impose the subsection 2F1.1(b)(8)(B) enhancement, but may exercise discretion to mitigate the effect of the enhancement by making a downward departure.[16]

### Conclusion

The conviction is affirmed. The case is remanded for resentencing not inconsistent with this opinion.

---

**16.** We note that Congress has recently added a new subsection (g) to 18 U.S.C. § 3742 to limit the authority of a district court to impose a sentence outside the applicable guidelines range upon a remand from a court of appeals. *See* PROTECT Act, P.L. 108–21, § 401(e), 117 Stat. 650, 671 (2003). Amended subsection 3742(g)(2)(A) provides that, upon remand, a sentence outside the guidelines may be imposed only on a ground that "was specifically and affirmatively included in the written statement of reasons required by section 3553(c) in connection with the previous sentencing of the defendant prior to the appeal."

Even if this new provision is applicable where the original sentence was imposed prior to the effective date of the amendment, a matter we need not decide, the new provision cannot logically apply in this case. Because the District Court did not impose a subsection 2F1.1(b)(8)(B) enhancement, the basis for a "cumulative effect" departure did not exist at Lauersen's initial sentencing. The possibility of such a departure arises now only because the Government has successfully appealed the sentence and obtained a remand for recalculation of the applicable guideline range. The purpose of the new subsection 3742(g) is to "prevent sentencing courts, upon remand, from imposing the same illegal departure on a different theory." H.R. Conf. Rep. 108–66, at 59 (2003), *reprinted in* 2003 U.S.C.C.A.N. 683, 694. In this case, the District Court did not make any departure.