[Cite as *State v. Johnson*, 2022-Ohio-4344.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Earle E. Wise, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2021 CA 00116 |
| TREJUAN JOHNSON | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:      Criminal appeal from the Stark County
Court of Common Pleas, Case No. 2020-
CR-2098

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      December 5, 2022

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

KYLE L. STONE      KIMBERLY KENDALL CORRAL
Prosecuting Attorney      403 St. Clair Avenue
By: LISA A. NEMES      Cleveland, OH  44103
Assistant Prosecuting Attorney
110 Central Plaza South, Ste. 510
Canton, OH  44702

*Gwin, J.*

{¶1}   Defendant-appellant Trejuan Carlson Johnson ["Johnson"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

**The indictment**

{¶2}   On November 19, 2020, the Stark County Grand Jury issued an indictment charging Johnson, with two counts of murder, in violation of R.C. 2903.02(B)/(D), R.C. 2929.02(B), unclassified felonies, each with a firearm specification under R.C. 2941.145(A); one count of improperly discharging a firearm at or into a habitation or a school safety zone, in violation of R.C. 2923.161(A)(1)(C), a felony of the second degree; and seven counts of felonious assault, in violation of R.C. 2903.11(A)(2)/(D)(1)(a), felonies of the second degree.   The first ten counts of the indictment each include a firearm specification under R.C. 2941.145(A).   Finally, the indictment charged Johnson with one count of having a weapon while under disability, in violation of R.C. 2923.13(A)(3)/(B).  a felony of the third degree.

**The shooting**

{¶3}   In the early morning hours of July 22, 2020, Camri Harvey and Aaron Lucas were asleep in the bedroom of their residence located at 1645 Clarendon Avenue SW., Canton, Ohio.  Harvey's two children, D.P. and C.L. were also present.[1]  1T. at 191[2].  The new born, C.L., slept with her and Lucas, while Harvey's older child, D.P., slept in his own bedroom.  1T. at 191; 195-196.  Three of Lucas's children were also present at the

---

[1] See, OH ST Supp. R. 44(H) and 45(D) concerning the use of personal identifiers
[2] For clarity, the jury trial transcript will be referred to as, "__T.__," signifying the volume and the page number.

residence. Child 1 was seven years old. 1T. at 193. Child 2 and Child 3 were nineteen-month-old twins. 1T. at 192. The three children were asleep on the living room couch. 1T. at 194-195.

{¶4} Sometime around 2:00 a.m., the couple were awakened by the sound of gunfire. 1T. at 196. The couple waited for the gunfire to stop. 1T. at 196. The pair then ran to check on the children. Lucas brought his three children to the bedroom. 1T. at 197. Child 1 was shaken but unhurt. Child 3 was crying and Child 2 was quiet. Id. Lucas's demeanor changed when he realized that Child 3 was bleeding from the buttocks and Child 2 was not breathing. 1T. at 198.

{¶5} Child 2 had suffered three gunshot wounds. 4T. at 458. The children were taken to the hospital; tragically, Child 2 died from his gunshot wounds. 1T. at 198. Two bullets were recovered from Child 2's body. Id. at 460-461. Child 3 was treated for a gunshot wound and released the following day. 1T. at 198-199.

## The investigation

{¶6} Security cameras were positioned around the outside of the home, and officers obtained a DVR with recordings of the security footage from the cameras. 1T. at 201; 4T. at 402-403; State's Exhibit 18. The footage shows three men approaching on foot, firing at the residence and running away. The faces of the three individuals cannot be seen on the footage.

{¶7} Among the evidence collected from the home were ten .45 caliber spent casings, thirteen 9mm spent casings, and projectiles found inside and outside of the home. Photographs depicting the damage to the home and numerous ballistics impact marks throughout the home were also obtained during the investigation.

{¶8} Larry Mackey of the Stark County Crime Laboratory testified as an expert in the field of firearms identification. 2T. at 322-326. Mackey examined the ten spent .45 caliber cartridge cases recovered from the scene, and determined that all ten were fired from the same handgun. Id. at 335. Mackey also compared the thirteen 9mm cartridge cases recovered from the scene. 2T. at 337-340. Mackey concluded that four of the thirteen bullets had been fired from one gun. Id. at 339. The remaining nine 9mm cartridges had also been fired from one gun, although not the same gun as the other four 9mm cartridges. Id. 339-341. In all, three guns were used in the shooting: one fired all ten of the .45 caliber bullets, one fired four 9mm bullets, and one fired nine 9mm bullets. 2T. at 341. Mackey's analysis of the two 9mm bullets recovered from Child 2's body was inconclusive as to which gun fired the fatal shots. Id. 342-345.

{¶9} Investigating officers canvased the neighborhood surrounding the home and identified several residences with doorbell cameras or other security cameras. 4T. at 405. Detective Michael Talkington of the Canton Police Department created a compilation of videos collected from the various cameras in the vicinity. 3T. at 383-385; State's Exhibit 18. One video camera directly across the street showed the front of the home at 1645 Clarendon. 4T. at 405. Video recorded from a camera at 1624 Frederick shows the two suspect vehicles just after the shooting traveling north on Frederick Avenue. Id. at 406. Videos from 1508 Clarendon and 2216 15th Street, SW also show the two vehicles on 15th Street traveling eastbound. Id. at 406. Investigators also obtained video from the Fulton and Blake areas that show the ramp that leads from Route 62 to I-77. Id.

**{¶10}** Video taken from the camera at 15th and Harrison allowed investigators to observe and identify the two suspect vehicles while they were headed eastbound and stopped at the traffic light at that intersection.  4T. at 406-407; State's Exhibit 10.  One of the vehicles is a silver Chrysler 200 with an issue with the front passenger-side tire.  Id. The other vehicle is a white Dodge Charger with black sidemirrors and black metallic rims on the tires.  Id.

**{¶11}** Investigating officers posted an internal be on the lookout bulletin ["BOLO"] for the two suspect vehicles.  4T. at 409.  A few days after the incident, police publicly released the video from the security camera of the residence, showing the individuals, on foot, firing shots at the house and running off.  Id. at 411.

**{¶12}** Among the leads on potential suspects, police received the names of "Jerk" and "J. Milli".  4T. at 412.  "Jerk" is the known alias of Jonas Hudson, an individual with whom Canton police are familiar based on past investigations.  Id. at 413.  Jerk resides in the Canton area but is originally from the Chicago area.  Id. Investigators were able to identify "J. Milli" as Jamal Smith and tracked him down in the Chicago area.  Id. Both Jerk and J. Milli are known affiliates of a street gang, the "Black Gangster Disciples." 4T. at 414.

**{¶13}** Detective Michael Volpe from the Canton Police Department testified that Aaron Lucas had been involved in a shooting incident in August 2021 and was deceased as a result of that incident.  4T. at 410.  Detective Volpe testified that Lucas had told him that Lucas had been involved in at least six robberies of street gang members and drug traffickers in Canton.  Id.  One of those robberies involved Lajentrius [sic.] Johnson, the

brother of the defendant-appellant. Id. Marijuana, money and possibly other controlled substances were taken during the robbery. Id. at 411-412.

**The suspect vehicles**

{¶14} Four days after the shooting, officers located the Chrysler 200 that had been depicted in the surveillance video. 4T. at 414. The car was being driven by Ki' Jier Jenkins. Jenkins informed the officers that he had gotten the car from his cousin, Davai Woodson. Id. at 414-415. The vehicle, which had West Virginia license plates, was registered to Marcus Gibbs. Id. at 415. Further investigation revealed that Woodson had obtained the car from Gibbs via a "crack rental." 4T. at 415. The car had a spare tire on the right front side of the car. 4T. at 415-416. The car also had damage to the front bumper. Id. at 416.

{¶15} On July 26, 2020, Detective Volpe assisted in the execution of a search warrant for the residence of Johnson's sister, Sabria. 4T. at 417. Johnson was outside the home. Johnson's vehicle was impounded at that time. Id. The car, a white Dodge Charger, had black mirrors and silver-gray rims. 4T. at 417-418. The car also had two distinctive rust marks on the driver side rear of the car. Id. at 418; State's Exhibit 16B; 16C and 16D. The license plate number for the vehicle was also identified. Id. at 419. The video from the morning of the shooting, however, showed a white Charger with black or black metallic rims. 4T. at 408; State's Exhibit 10.

{¶16} Detective Volpe asked Johnson if he knew the father of the deceased nineteen-month-old baby. Johnson responded the father was an individual who had robbed Johnson's brother. 4T. at 419.

{¶17} The discrepancy with the rims on the white Dodge Charger prompted investigators to run the license plate number through the license plate reader ("LPR"). 3T. at 379-380. The LPR takes video and records license plate numbers of vehicles that pass by cameras in the LPR system. Id. at 380. The search yielded several results, including a video and picture recorded July 17, 2020. Id. at 380-382; State's Exhibit 8; 9. The video showed that Johnson's vehicle, 5 days before the shooting, had black rims on it. Id.

### Facebook

{¶18} Detective Volpe received business records for the Facebook page or account associated with Johnson. 4T. at 425. Records from Johnson's Facebook account contained a photograph of his car. Id. at 431. The picture showed a white Dodge Charger with black side mirrors, black rims, and the same license plate number as Johnson's impounded car. Id. at 431; State's Exhibit 7-C.

{¶19} Johnson's Facebook page further had a group photograph, which included Johnson, Jerk (Jonas Hudson), and Davai Woodson. Id. at 432-433; State's Exhibit 11.

### Whereabouts of Johnson before the shooting

{¶20} Joy Hastings has been living in Florida since 2019. 2T. at 246. However, she has known Johnson and Davai Woodson since high school. Id. Hastings testified that Johnson and Woodson had been friends since high school. Id. at 247.

{¶21} On July 21, 2020, Woodson asked Hastings to come to Ohio. 2T. at 247. Woodson paid for her airline ticket. Id. Woodson was driving a silver car with a problem in the front end. Id. at 249; State's Exhibit 13-B. Hastings was drinking and smoking marijuana throughout the evening. 2T. at 250, 251, 252, 253.

{¶22} At some point, Hastings returned to her father's house to shower and change clothes. 2T. at 252-253. Hastings then went to a bar where she was contacted by Woodson to come and meet him at "Legit's" house. Id. at 254, 256. Hastings testified that "Legit" is related to Johnson. 2T. at 256. When she arrived, Woodson, "Legit" and Jerk were present. 2T. at 255-256. Hastings told Detective Volpe that she had also seen Johnson there at that time, but now she was not sure. 2T. at 256, 258, 263. Hastings left and eventually returned to her father's home around 2:00 am. Id. at 256-257.

{¶23} Hastings testified that Detective Volpe came to Florida to interview her on August 13, 2020. 2T. at 262. She claimed the detective threaten her that she could be charged criminally if she did not tell the truth. Id. at 261; 262-263. Further, Detective Volpe mentioned to her that there was a $15,000.00 reward for a conviction in this case. 2T. at 264. However, Hastings testified that she was not here for the reward money. Id. at 266. Further, she testified she told Detective Volpe the truth. 2T. at 262-263.

### Johnson is interviewed by the police

{¶24} Johnson was interviewed by Detective Volpe and special agent Mark McMurphy on August 7, 2020. 4T. at 423. Johnson again told the detective that Lucas had robbed his brother. Id. at 423. Johnson admitted that he knew Jonas Hudson as "Jerk." 4T. at 424. Johnson denied that he knew "J. Milli." Johnson told the officers that on July 22, 2020 he had been at his brother Lagentrius Johnson's house all day and night. Id. Lagentrius Johnson lived in the Bexley Townhome apartments near 37th Street and Martindale Road, Canton, Ohio. 4T. at 435.

{¶25} The most direct route to get from the Bexley apartments to the home where the shooting occurred at 1645 Clarendon, would be to take Martindale Road southbound

to 30th Street.  Then, traveling westbound on 30th Street, turn southbound on Market Avenue, and then merge on to Route 62 westbound.  4T. at 436; State's Exhibit 15.  From there, one would head south on I-77 to Route 30, take Route 30 west to the Harrison Avenue exit, and head south on Harrison to its intersection with 15th Street.  Id. at 437.  It is here, at the intersection of 15th and Harrison that video shows the Dodge Charger and the Chrysler 200 stopped at the traffic light the morning of the shooting.  4T. at 406-407, 437.

## Cell phone records

{¶26}  Upon learning the phone numbers for Davai Woodson and "Jerk" [Jonas Hudson], Detective Volpe obtained search warrants for their phone records.  4T. at 421.  Detective Volpe downloaded the records for Davai's phone number, sent electronically by the phone company in response to the warrant, and stored the records on a disc. Id. at 421; State's Exhibit 21.  He did the same with the records received for Jerk's phone number.  Id. at 421; State's Exhibit 22.  Detective Volpe provided these records to Jacob Kunkle, a special agent with the Federal Bureau of Investigation supervising the Canton and Mansfield offices, for analysis.  2T at 293; 4T. at 421-422.

{¶27}  Agent Jacob Kunkle is part of the cellular analysis survey team, which is comprised of agents specializing in cellular phone record analysis.  2T. at 295-296.  The analysis involves looking at cellular phone records and determining the general areas where the  phones  were  located  when communications were made or received.  Id. at 298.  The phone records are referred to as a "Call Detail Record" ["CDR']).  These are records that are kept by the particular phone company[3] in the normal course of business

---

[3] In this case Verizon and Sprint.  2T. at 300 – 301.

to document communications of phones on the network. Id. at 299. The information in these records includes the numbers involved in the communications, the date, time, duration of communications; and the cellphone tower, and in some cases, the particular side of a tower used by the phone. Id. at 299-300. Agent Kunkle uses this information in his analysis to ascertain a general idea of where the phone was on the map during a communication. Id. at 300.

{¶28} Without objection, the trial court certified Agent Kunkle as an expert in historical cell phone records analysis. 2T. at 297-298.

{¶29} Agent Kunkle analyzed records from Verizon and Sprint within a specific time frame of the evening of July 21 to the early morning of July 22, 2020. 2T. at 298. The Verizon phone, number 330-605-xxxx belonged to Davai. The Sprint phone, 708-359-xxxx, belonged to Jerk [Jonas Hudson]. 2T. at 300-301; 421; State's Exhibits 21, 22. Agent Kunkle identified and mapped the towers used to make or receive calls from these two phones during the specified time period. 2T. at 303. He created a report, based on his analysis, drawing conclusions about the location of the phones. 2T. at 312, 319; State's Exhibit 23.

{¶30} Agent Kunkle's report documented the cell phone activity of the phone belonging to Jerk [Jonas Hudson] between 11:19 p.m. on July 21, 2020, and 3:03 a.m. on July 22, 2020. 2T. at 312. Communications taking place at 11:19 p.m. and then 11:25 p.m. used different towers, which indicates the phone moved from an area to the southwest of Massillon toward the Hills and Dales or Avondale area of Canton. 2T. at 313-314. At 11:28 p.m., the phone used another tower, indicating the phone had moved from west to east. Id. at 314. The phone used another tower, at 11:42 p.m. indicating

the phone had moved again, this time north, in the direction of the Bexley apartments where Lagentrius Johnson lived. Id. at 315. The next activity on the phone occurred at 3:03 a.m. when it used a tower near the Bexley apartments. Id. at 319.

{¶31} Agent Kunkle's report initially places the phone belonging to Davai in the Massillon area at 10:20 p.m. 2T. at 316; State's Exhibit 23. Phone activity at 10:56 p.m. show movement toward the Canton area. Id. at 317. Between 10:56 and 11:51 p.m. the phone utilizes different towers for communications, reflecting the phone moved north, in the vicinity of the Bexley apartments. Id. at 317; State's Exhibit 23. From 12:00 a.m. to 12:37 a.m., the phone had several communications using one tower, but two separate sides of that tower. Id. at 317-318; State's Exhibit 23. The phone used that tower again at 1:35 and 1:36 a.m. Id. Again, at 2:46 and 2:47 a.m., the phone used that same tower in the northeast part of Canton, near the Bexley apartments. Id. at 318.

### Johnson's cellmates testify at trial

{¶32} Detective Volpe received information that Lamar Mitchell, an inmate at the Lorain Correctional Institution ["LCI"] had information concerning the shooting. 4T. at 426-427. Detective Volpe interviewed Mitchell on August 25, 2020 and again the second week of September, 2020 at the prison. 4T. at 427-428.

{¶33} On September 17, 2020, Detective Volpe again traveled to LCI having received information that a second inmate, Richard Bennett, also claimed to have information regarding the shooting. 4T. at 428-429.

### *Lamar Mitchell*

**{¶34}** At trial, Mitchell testified that he arrived at LCI on August 11, 2020. 3T. at 356. At that time due to the Covid-19 emergency, Mitchell was placed in quarantine with one cellmate, Johnson. 3T. at 356-357.

**{¶35}** During conversations with Johnson, Mitchell testified that Johnson told him that his brother had been robbed of "some weed…Money... [and] a little bit of heroin." 3T. at 359. Mitchell testified that Johnson told him that Johnson, "J. Milli, some guy from Chicago, somebody named "Jerky" and "Davai" decided to rob the home of the person who had robbed Johnson's brother. 3T. at 359-360. The individuals were at Legit's house prior to the shooting. 3T. at 362.

**{¶36}** Mitchell testified that Johnson told him the group used two cars, a "crack rental" and a Dodge Charger. 3T. at 360. The cars were parked away from the house. Id. at 361. Mitchell testified that at first, Johnson told Davai to go up to the house; however, Davai got scared so all of the individuals "went around the side of the house and opened fire on the house." 3T. at 361. All of the individuals had guns. Id. at 362. After the shooting, the individuals returned to Legit's apartment. 3T. at 362. Johnson further told Mitchell that his car had dark rims; however, after the shooting Johnson changed them for chrome rims. 3T. at 363.

**{¶37}** Mitchell reported this information. 3T. at 363. He eventually spoke with Detective Volpe. Mitchell testified that he was released from prison early after he agreed to testify against Johnson. 3T. at 364-365. Mitchell testified that although there is a code that one does not snitch, "when there's a child involved all that go out the window with me." 3T. at 365.

### *Richard Bennett*

{¶38}  Bennett shared a cell with Johnson for about five days while they were housed at LCI.  2T. at 272.  Bennett testified that Johnson, while in the cell, repeatedly put a towel across his head and, while wearing his facemask, would ask Bennett whether he could identify him.  Id. at 273.  Johnson told Richard he was being investigated for murder and shared details of the incident.  Id. at 273-274.  Johnson told Bennett that he was upset that someone had stolen $11,000.00 and some marijuana from him, and so he went and shot the house up with two individuals from Chicago.  Id. at 274.  Johnson described the two men as "some bad boys," and stated that they were involved in the Black Gangster Disciples.  Id. Johnson also told Richard how they drove near the house and parked down on the corner and took the license plates off.  Then the three of them walked to the house.  Id. at 274-275.  Johnson told Richard that he had been wearing a black hoodie and a face mask.  Id. at 275.  Bennett further testified that Johnson told him that the police had the car.  2T. at 275.  Bennett was permitted to testify over objection that Johnson had told Bennett that a few years ago Johnson had been shot in the leg. 2T. at 276-277; 290.  Bennett called his wife to do a three-way telephone call to the Canton Police Department to report the information.  2T. at 290-291.

{¶39}  The defense presented no witnesses.

### **Verdict and sentence**

{¶40}  Following deliberations, the jury returned verdicts finding Johnson guilty on counts one through ten of the indictment, and guilty of each of the ten attendant firearm specifications.

{¶41}  Prior to sentencing, the court found Johnson guilty on Count Eleven of the indictment, Having weapons while under disability.  On October 5, 2021, the court issued its judgment of conviction sentencing Johnson to a total minimum prison term of 72 years up to a maximum prison term of 76 years to life in prison.

*Assignments of Error*

{¶42}  Johnson raises nine Assignments of Error,

{¶43}  "I.  THE TRIAL COURT FAILED TO MEET THE REQUIREMENTS OF A CRIM.R. 43 WAIVER, RESULTING IN A WAIVER OF PRESENCE WHICH WAS NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY MADE IN VIOLATION OF APPELLANT TREJUAN JOHNSON' S RIGHT TO BE PRESENT AT ALL STAGES OF THE CRIMINAL TRIAL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PROVISION OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶44}  "II.   THE TRIAL COURT ERRED BY FORCING APPELLANT TO PROCEED TO TRIAL WITH ANONYMOUS JURORS.

{¶45}  "III.   THE STATE ENGAGED IN PROSECUTORIAL MISCONDUCT VIOLATING APPELLANT JOHNSON'S RIGHTS TO A FAIR TRIAL AND THE PRESUMPTION OF INNOCENCE WHEN IT INSTRUCTED THE JURY THAT IT'S OBLIGATION IS TO FIND HIM GUILTY EVEN IF IT FINDS HE DIDN'T HAVE A PURPOSE TO KILL.

{¶46}  "IV.   THE INDIVIDUAL AND CUMULATIVE EFFECT OF DEFENSE COUNSEL'S PERFORMANCE WAS SO DEFICIENT THAT APPELLANT TREJUAN JOHNSON WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN

VIOLATION OF HIS RIGHTS GUARANTEED UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION OF THE STATE OF OHIO.  [sic.]

{¶47} "V.   THE COURT ERRED WHEN IT PERMITTED THE IMPROPER ADMISSION OF TESTIMONY AS TO THE CONTENT OF UNAUTHENTICATED RECORDS, THAT CONSTITUTES PLAIN ERROR IN VIOLATION OF DEFENDANT TREJUAN JOHNSON'S DUE PROCESS AND CONFRONTATION RIGHTS GUARANTEED UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND CORRESPONDING PROVISIONS OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶48} "VI.  THE TRIAL COURT ERRED IN ALLOWING IRRELEVANT, OVERLY PREJUDICIAL EVIDENCE THAT APPELLANT WAS INVOLVED IN AN UNRELATED PRIOR SHOOTING OVER DEFENSE OBJECTION.

{¶49} "VII.  THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶50} "VIII.  THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE OFFENSE BEYOND A REASONABLE DOUBT.

{¶51} "IX. THE CUMULATIVE EFFECT OF MULTIPLE ERRORS DEPRIVED APPELLANT OF HIS CONSTITUTIONALLY GUARANTEED RIGHT TO A FAIR TRIAL UNDER THE FEDERAL AND STATE CONSTITUTION."

{¶52}  Initially we note a deficiency in Johnson's appellate brief; it does not comply with App.R. (A)(7), which provides,

The appellant *shall include in its brief*, under the headings and in the order indicated, *all of the following*: * * * An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations* to the authorities, statutes, *and parts of the record on which appellant relies*. The argument may be preceded by a summary.

* * *

(D) References in Briefs to the Record.  References in the briefs to parts of the record shall be to the pages of the parts of the record involved; e.g., Answer p. 7, Motion for Judgment p. 2, Transcript p. 231.  Intelligible abbreviations may be used.  If reference is made to evidence, the admissibility of which is in controversy, reference shall be made to the pages of the transcript at which the evidence was identified, offered, and received or rejected.

Emphasis added.

{¶53} Because Johnson fails to properly reference portions of the transcript supporting his claims, Johnson cannot demonstrate any claimed error.  *See Daniels v. Santic,* 11th Dist. Geauga No. 2004-G-2570, 2005-Ohio-1101, ¶13-15.  *See, also*, App.R. 12(A)(2) and 16(A)(7); *Graham v. City of Findlay Police Dept.* 3rd Dist. Hancock No. 5-01-32, 2002-Ohio-1215 at *4 (stating, "[t]his court is not obliged to search the record for some evidence of claimed error.   * * * Rather, an appellant must tell the appellate court specifically where the trial court's alleged errors may be located in the transcript"); *State ex rel. Petro v. Gold,* 166 Ohio App.3d 371, 2006-Ohio-943 (10th Dist.), ¶ 94, *appeal not*

*allowed*, 110 Ohio St.3d 1439, 2006-Ohio-3862, *reconsideration denied*, 111 Ohio St.3d 1418, 2006- Ohio-5083; *Porter v. Keefe,* 6th Dist. Erie No. E-02-018, 2003-Ohio-7267, ¶ 109-113.  As the Ohio Supreme Court has observed,

> The omission of page references to the relevant portions of the record that support the brief's factual assertions is most troubling.  Appellate attorneys should not expect the court 'to peruse the record without the help of pinpoint citations' to the record.  *Day v. N. Indiana Pub. Serv. Corp.* (C.A.7, 1999), 164 F.3d 382, 384 (imposing a public reprimand and a $500 fine on an attorney for repeated noncompliance with court rules).  In the absence of the page references that S.Ct.Prac.R. VI(2)(B)(3) requires, the court is forced to spend much more time hunting through the record to confirm even the most minor factual details to decide the case and prepare an opinion.  That burden ought to fall on the parties rather than the court, for the parties are presumably familiar with the record and should be able to readily identify in their briefs where each relevant fact can be verified.

*State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, ¶ 13; *See also, State v. Davis*, 5th Dist. Licking No. 2007-CA-00104, 2008-Ohio-2418, ¶ 91.

**{¶54}**  However, in the interest of justice, we shall attempt to consider Johnson's assignments of error.

I.

**{¶55}** In his First Assignment of Error, Johnson contends he was not physically present for pretrial hearings and for "substantive aspects" of voir dire dealing with pretrial publicity. [Appellant's brief at 14].

**Standard of Appellate Review**

**{¶56}** An accused has a fundamental right to be present at all stages of his criminal trial. Ohio Constitution, Article I, Section 10; Crim.R. 43(A).

**{¶57}** In *State v. Green*, 90 Ohio St.3d 352, 2000-Ohio-182, 738 N.E.2d 1208, the Ohio Supreme Court held a defendant has a fundamental right to be present at all stages of his criminal trial; however, an accused's absence does not necessarily result in prejudicial or constitutional error. Id. at 371, 2000-Ohio-182, 738 N.E.2d 1208. The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. Id., *citing*, *Snyder v. Massachusetts*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679(1934); *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486(1985); *State v. Williams*, 6 Ohio St.3d 281, 285-287, 452 N.E.2d 1323, 1329-1331(1983); *State v. Roe*, 41 Ohio St.3d 18, 27, 535 N.E.2d 1351, 1362(1989). Relative to the case at bar, the Court in *Green* further noted,

> Moreover, Green's counsel expressly waived Green's presence at these discussions. *See United States v. Gagnon*, 470 U.S. at 528, 105 S.Ct. at 1485, 84 L.Ed.2d at 491 (trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend"); *United States v. Gallego* (C.A.2,

1999), 191 F.3d 156, 171-172 (waiver can be inferred from accused's failure to object to exclusion); *Polizzi v. United States* (C.A.2, 1991), 926 F.2d 1311, 1322-1323 (counsel can waive accused's right to be present); *State v. Hill,* 73 Ohio St.3d at 444, 653 N.E.2d at 281. Thus, we reject the fifteenth proposition of law.

90 Ohio St.3d 352, 372, 2000-Ohio-182, 738 N.E.2d 1208.

**Issue for appellate review**: *Whether Johnson was denied due process to the extent a fair and just hearing was thwarted by his absence from portions of voir dire*

**{¶58}** Our own review of the record indicates that Johnson was present for arraignment. Transcript, Dec. 4, 2020 at 4. Johnson was also present for the time waiver. Transcript, Feb. 16, 2021 at 4. Johnson was present for the pretrial conference. Transcript, June 3, 2021 at 3. Johnson was present for the continuance of the trial due to the death of Aaron Lucas. Transcript, Aug. 9, 2021 at 3-4. Johnson was present for voir dire. 1T. at 7. Johnson was present for his attorney's pretrial motions made after voir dire. 1T. at 175-180.

**{¶59}** As noted by the state, the only indication in the record that Johnson was not present during voir dire or any other pretrial proceedings was when the trial court conducted the separate, individual voir dire of jurors who indicated some familiarity with the case in response to questionnaires. 1T. at 32-33.

**{¶60}** During voir dire, Johnson was physically present when the trial judge stated she would privately question potential jurors about pretrial publicity in a room right off of the courtroom, with the attorneys and the court reporter present. 1T. at 32-34. The court noted on the record that the separate voir dire took place in the jury deliberation room, as

opposed to a sidebar at the bench in the courtroom, due to "masking requirements and social distancing restrictions in effect because of the COVID pandemic. " 1T. at 35-36. The court inquired as to whether Johnson had any objection to conducting voir dire in this fashion. Id. at 36. Defense counsel responded:

> Your Honor, I had an opportunity to speak with [Johnson] in private, I discussed with him that there were positive answers to the questionnaire about publicity.
>
> I discussed with him that typically we would handle those matters at a sidebar and typically he would be in the courtroom when that's going on, even though we were doing it away from the defense table.
>
> I said based upon the COVID social distancing we needed to do it in a room in private where he could not be with me. He gave me his consent that I could go forward and question these jurors while he waits in another area.

1T. at 36. The state further added,

> [I]f this were not COVID and there was not social distancing, this would take place at the bench.
>
> The Defendant would still not be a participant in the sidebars because he would be seated at counsel table some fifteen to twenty feet away from where the attorneys were discussing these matters with the judge and the potential jurors.

But in this case, because of the social distancing requirements, we've chosen to do it this way and [defense counsel] has indicated his client's consent to this.

And I want the record to reflect that if at any time during this [defense counsel] needs to discuss one of these jurors with his client he's going to have the ability to do that because he's just down the hall from us behind a closed door in the company of a couple deputies.

1T. at 37-38.

{¶61} Crim.R. 52 distinguishes between errors to which the defendant objected at trial and errors to which the defendant failed to object at trial. *See, State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14. If the error is one to which the defendant objected at trial, an appellate court reviews the error under the Crim.R. 52(A) harmless-error standard and "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." Id. at ¶ 15.

{¶62} When a defendant forfeits the right to assert an error on appeal by failing to object during trial, an appellate court applies a plain-error standard of review. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21-22. Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. An appellate court has discretion to notice plain error and therefore "is not required to correct it." *Rogers* at ¶ 23.

{¶63} We find no manifest miscarriage of justice occurred and further, a fair and just hearing was not thwarted by his absence, because Johnson was fully informed of the procedure and he waived his presence. As is true in *Williams,* counsel for Johnson was present and actively participated in the individual voir dire. Counsel was given the opportunity to consult with Johnson at any time. Further, because counsel waived Johnson's presence, Johnson's claim lacks merit. *State v. Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶148; *State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶103 ("Hale contends that counsel may not waive a client's right to be present, but he is incorrect"). *See, also, State v. Stafford,* 5th Dist. Ashland No. 18-COA-036, 2020-Ohio-3993, ¶31, *citing Henderson v. Lane*, 613 F.2d 175, 179 7th Cir. 1980). Moreover, we find Johnson's absence was not prejudicial because the jury received neither testimony nor evidence during the in chambers examination. *State v. Frazier*, 115 Ohio St.3d 139, ¶ 145; *State v. Hale,* 119 Ohio St.3d 118, ¶102. Finally, we note that the individual voir dire was recorded and has been transcribed as part of the record on appeal. Johnson points to no question or answer by any juror so examined that would have resulted differently had he been present.

{¶64} We find no manifest miscarriage of justice occurred and a fair and just hearing was not thwarted because any error in the trial court's procedure did not affect the outcome of Johnson's jury trial. We further find error, if any, did not affect Johnson's substantial rights and, therefore, is harmless beyond a reasonable doubt.

{¶65} Johnson's First Assignment of Error is overruled.

II.

{¶66} In his Second Assignment of Error, Johnson contends that the failure to provide counsel with the names and addresses of the potential jurors constitutes structural error mandating a reversal of his convictions.  [Appellant's brief at 17].

**Standard of Appellate Review**

{¶67} In *State v. Hill*, the Ohio Supreme Court reviewed a case in which a defendant did not object to the use of an anonymous jury, or raise any issue regarding juror anonymity at trial.  92 Ohio St.3d 191, 196, 2001-Ohio-1411, 749 N.E.2d 274.  The Court began by noting,

> [W]e decline to hold that structural error is present in every situation in which those fundamental rights are allegedly limited in any way.  We note that appellee's trial was open to the public and that newspaper reporters were present.
>
> Appellee's failure to express any disagreement whatsoever at trial to the use of an anonymous jury is the key factor that distinguishes this case from the federal cases on juror anonymity cited by appellee.  In many of those cases, juror anonymity was contested at trial, and the trial courts decided to use anonymous juries after being made aware of the defendants' protestations that fundamental rights were being compromised.

92 Ohio St.3d 191, 198, 2001-Ohio-1411, 749 N.E.2d 274.  The Ohio Supreme Court held,

> The use of an anonymous jury does not necessarily involve the violation of a fundamental right.  There is no unqualified constitutional right

to know the identity of jurors. In the instant case, the seating of an anonymous jury did not necessarily render the trial so fundamentally unfair that it could not be a reliable vehicle for the determination of appellee's guilt or innocence. *See, Rose*, 478 U.S. at 577–578, 106 S.Ct. at 3106, 92 L.Ed.2d at 470. We find that this case does not present an example of a violation of a fundamental constitutional right that would lead to the basic unfairness that was present in cases such as *Gideon, Tumey, Vasquez, McKaskle*, *Waller,* or *Sullivan*. We do not believe that the anonymous jury rule impinges on fundamental rights in the same way as the deprivation of counsel in *Gideon,* or the biased trial judge in *Tumey*, or the racial discrimination in *Vasquez*. Accordingly, to the extent that the court of appeals held that structural error warrants the reversal of appellee's convictions, we reverse that judgment.

92 Ohio St.3d 191, 199, 2001-Ohio-1411, 749 N.E.2d 274. The Court in *Hill* concluded that because "this is not a structural-error situation, we must proceed to consider whether plain error occurred in the use of an anonymous jury." 92 Ohio St.3d 191, 200, 2001-Ohio-1411, 749 N.E.2d 274.

{¶68} In the case at bar, as in *Hill,* the courtroom was open to the press and the public. Further, a complete transcript of all voir dire proceedings has been filed with the record on appeal. Additionally, the names of the jurors are contained on the verdict forms filed in the record.

{¶69} Therefore, we will consider whether plain error occurred in Johnson's case. When a court of appeals engages in a plain-error analysis, it must conduct a complete

review of all relevant assignments of error in order to determine whether a manifest miscarriage of justice has occurred that clearly affected the outcome of the trial. *Hill,* 92 Ohio St.3d 191, 204, 2001-Ohio-1411, 749 N.E.2d 274.

**Issue for appellate review**: *Whether the failure to provide defense counsel with the names and addresses of the potential jurors resulted in a manifest miscarriage of justice that clearly affected the outcome of Johnson's jury trial.*

{¶70} Johnson argues that the First Amendment right of access attaches to juror names, citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629(1984). [Appellant's brief at 15]. Because *Press-Enterprise Co. v. Superior Court* is distinguishable on the facts from the present case, it provides very little support for Johnson's argument,

> *Press-Enterprise* involved a newspaper's first amendment claim that it had the right to be present during voir dire examination of prospective jurors. The trial court denied the newspaper's request on the ground that the privacy rights of prospective jurors might be violated. Thus, all but approximately three days of the six-week-long voir dire examination was closed to the public and the media. *Press-Enterprise*, 464 U.S. at 503-04, 104 S.Ct. at 820-21, 78 L.Ed.2d at 634-35.

> The United States Supreme Court held that this procedure violated the guarantee of open public proceedings in criminal trials. In so holding, however, the Court made clear that it was concerned about an order which excluded not only the public, but also the media from courtroom proceedings. (*See Press-Enterprise*, 464 U.S. at 509-10, 104 S.Ct. at 824,

78 L.Ed.2d at 637-38 *quoting Globe Newspaper Co.* v. *Superior Court* (1982), 457 U.S. 596, 606, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248, 257, as follows: "'[T]he circumstances under which the *press* and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one.'" (Emphasis added). *In that context* (namely, an order excluding the media from court proceedings), the court wrote that the presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *Press-Enterprise*, 464 U.S. at 510, 104 S.Ct. at 824, 78 L.Ed.2d at 638.

*People v. Benson,* 251 Ill.App.3d 144, 146-147, 621 N.E.2d 981, 983(1983).

**{¶71}** We find no error under a plain error analysis in the court's use of juror numbers in place of juror names in the instant case. In the case at bar, the trial court gave the jurors a plausible and nonprejudicial reason for not disclosing their identities during voir dire making clear that anonymity was not being invoked to prevent them from being harmed by this particular defendant. *Hill,* 92 Ohio St.3d at 199, 2001-Ohio-1411, 749 N.E.2d 274. As previously noted, the courtroom was open to the press and the public. Johnson was present during voir dire, and as noted in our disposition of Johnson's First Assignment of Error, waived his presence during the individual voir dire in which his attorney participated. An extensive voir dire of the potential jurors was conducted, and we can find no indications in the record that Johnson's attorney's efforts to seat an acceptable jury were impeded in any way by the unavailability of the names and addresses of jurors. *Hill,* 92 Ohio St.3d at 199, 2001-Ohio-1411, 749 N.E.2d 274.

{¶72} Thus, here, as in *Hill,* we fail to perceive the existence of error.

{¶73} We find no manifest miscarriage of justice occurred because any error in the trial court's procedure did not affect the outcome of Johnson's jury trial. We further find error, if any, did not affect Johnson's substantial rights and, therefore, is harmless beyond a reasonable doubt.

{¶74} Accordingly, Johnson's Second Assignment of Error is overruled.

III.

{¶75} In his Third Assignment of Error, Johnson argues that the prosecutor made improper statements during jury selection thereby depriving him of a fair trial.

**Standard of Appellate Review**

{¶76} Allegations of prosecutorial misconduct implicate due process concerns, and the touchstone of the analysis is the "'fairness of the trial, not the culpability of the prosecutor.'" *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 92, *quoting Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

> If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993). With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[A] defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of

evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶30 (8th Dist.2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988).

*State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 109.

**{¶77}** Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review de novo. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009) *citing United States v. Francis*, 170 F.3d 546, 549 (6th Cir.1999) *citing United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993).

**{¶78}** Johnson did not object to the comments to which he now claims error. Therefore, we must find plain error in order to reverse.

**Issue for appellate review**: *Whether the state committed misconduct and if so did the misconduct prejudicially affect Johnson's substantial due process rights.*

**{¶79}** Johnson first contends that the following exchange undermined his presumption of innocence. After indicating that Johnson was charged with murder, the prosecutor continued,

> It [the indictment] says that the defendant caused the death of somebody while committing a second-degree felony offense of violence. This murder does not have purpose as one of its elements.
>
> What I have to prove to you are the elements of improperly discharging, the elements of felonious assault and that he's the person that committed these offenses. And your obligation is to find him guilty even if he didn't have a purpose to kill, do you understand?

1T. at 117.  [Appellant's brief at 17-18].

{¶80} The prosecutor's statements were correct statements concerning the charges.  None of the crimes for which Johnson had been indicted required the state to prove that he acted purposely.  The trial court correctly instructed the jury that they must find that the state proved each element of each crime beyond a reasonable doubt before they could find Johnson guilty.

{¶81}  Johnson next takes issue with the following exchange occurring during voir dire.  The state explained that because the jurors were not there to witness the events as they occur, it would not be possible to convince them "beyond all doubt" of what happened.  1T. at 110.  Accordingly, the prosecutor explained, the law recognizes that there is going to be some degree of doubt,

> * * * So now we understand why the law requires only proof beyond a reasonable doubt, everybody understand that, and not all doubt, not beyond a shadow of a doubt because you were not there, you didn't see it. So, it's up to me to present the evidence that convinces you by proof beyond a reasonable doubt, everybody's going to hold me to that burden and not a higher burden, right?

1T. at 110 – 111.

{¶82}  R.C. 2901.05 provides,

> (E) "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.  It is a doubt based on reason and common sense.  *Reasonable doubt is not mere possible doubt,*

*because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.* "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

Emphasis added.

**{¶83}** We do not find the statements concerning the state's burden of proof beyond a reasonable doubt cited by Johnson to be improper within the context of voir dire and the entire trial.

**{¶84}** The jury is presumed to follow the instructions of the trial court. *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus. Johnson has not pointed to any evidence in the record that the jury failed to follow the instructions of the court. There is no evidence in the record that the jury abandoned their oaths, their integrity or the trial court's instructions and found Johnson guilty based upon the prosecutor's statements cited by Johnson.

**{¶85}** We find no manifest miscarriage of justice occurred because any error in the prosecutor's statements to the jury did not affect the outcome of Johnson's jury trial. The statements occurred before the jury was impaneled and evidence was introduced and the trial court properly instructed the jury on the burden of proof, the elements of each crime and the degree of proof beyond a reasonable doubt. Johnson has not raised any error in this appeal concerning the trial court's instructions to the jury. We further find error, if any, did not affect Johnson's substantial rights and, therefore, is harmless beyond a reasonable doubt.

{¶86}  Johnson's Third Assignment of Error is overruled.

V.

{¶87}  For ease of discussion we shall address Johnson's remaining Assignments of Error out of sequence.

{¶88}  In his Fifth Assignment of Error, Johnson contends that the trial court erred by admitting the cell phone records from the phones of Woodson and Jerk, as well as FBI Agent Jacob Kunkle's expert testimony and report into evidence.  [Appellant's brief at 36].

**Standard of Appellate Review**

{¶89}  "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence."  *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).  "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion.  *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).  However, we review de novo evidentiary rulings that implicate the Confrontation Clause.  *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010)."  *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶97.

**Issue for appellate review**: *Whether the trial court properly admitted Agent Kunkle's expert testimony and report concerning historical cell-site analysis, in which he used call detail records from cell phones and the locations of cell towers to approximate certain cell phones locations at particular times.*

{¶90}  At the outset, we note that no witness testified concerning the contents of any cell phone conversation or text message.  Rather, the testimony and records were analyzed to determine the location of the cell phones during a specific period of time.

*Evid.R. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

**{¶91}**  Johnson first relies on Evid.R. 702, which states a witness may testify as an expert if: (A) the testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education on the topic; and (C) the testimony is based on reliable scientific, technical, or other specialized information.  [Appellant's brief at 24 -30].

**{¶92}**  The Supreme Court of Ohio has adopted the standard set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for adjudging the reliability of an expert's opinion.  *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998).  This standard requires courts to assess reliability by considering: (1) whether the method or theory relied on has been tested, (2) whether the method or theory has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the theory or methodology has gained general acceptance in the scientific community.  *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 25; *Miller* at 611, 687 N.E.2d 735.  The analysis of reliability is flexible, *Miller* at 611, 687 N.E.2d 735, and "none of these factors is a determinative prerequisite to admissibility."  *State v. Nemeth*, 82 Ohio St.3d 202, 211, 694 N.E.2d 1332 (1998).

**{¶93}**  Johnson argues that the cell phone records, the report and testimony of Agent Kunkle should have been excluded under Ohio Rules of Evidence 702 and 403 because the state's expert's methodology is unreliable, irrelevant, and its probative value is substantially outweighed by the danger of unfair prejudice.  *Daubert v. Merrell Dow*

*Pharmaceuticals*, 509 U.S. 579, 597. [Appellant's brief at 24]. Johnson claims this evidence has been deemed unreliable. In support of his argument, Johnson cites to *United States v. Evans*, 892 F.Supp.2d 949 (N.D.Ill.2012). [Appellant's brief at 29].

*Reliability*

**{¶94}** In *Evans,* the prosecution sought to call an FBI special agent to testify about "the operation of cellular networks and how to use historical cell site data to determine the general location of a cell phone at the time of a particular call." 892 F.Supp.2d at 951. The agent used the "granulization" theory and proposed to testify that phone calls placed from the defendant's cell phone could have come from the building where the victim was held for ransom. Id. The court held an evidentiary hearing, pursuant to Evid.R. 702 and *Daubert,* to determine whether the proposed evidence and analysis were admissible.

**{¶95}** The Illinois Federal District Court concluded that the FBI agent was qualified to testify as an expert regarding the operation of cellular networks and the "granulization" theory. 892 F.Supp.2d at 955. The court further concluded that the agent's testimony on the subject is reliable. Id. The court, however, held that the agent's "granulization" theory was not reliable because (1) the agent did not account for the factors that can affect whether a cell phone connects to the closest tower or is rerouted to another tower, and (2) the theory has not been subject to scientific testing or formal peer review, and has not gained general acceptance in the scientific community. Id. at 956.

**{¶96}** We note that numerous courts have rejected *Evans* and the identical argument made by Johnson with respect to historical cell-site analysis. In *State v. Parham,* the court noted,

While we acknowledge the inherent inexactitude of historical cell-site analysis, we do not find that inexactitude fatal to the admission of evidence developed using historical cell-site analysis. "These vagaries of cell phone technology affect the persuasiveness of the circumstantial evidence, but they do not render [an expert's] testimony inadmissible." *United States v. Rosario*, S.D.N.Y. No. 09-CR-415-2 (VEC) (Nov. 14, 2014); *accord United States v. Jones*, 918 F.Supp.2d 1, 5 (D.D.C.2013) ("[N]umerous [ ] courts have concluded that the mere existence of factors affecting cell signal strength that the expert may not have taken into account goes to the weight of the expert's testimony and is properly the subject of cross-examination, but does not render the fundamental methodology of cell set analysis unreliable."). The approach is consistent with *Daubert,* which held "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. at 596, 113 S.Ct. 2786.

*Based on the foregoing analysis, we join the multiple other courts that have concluded that historical cell-site analysis is accurate enough and well accepted enough to allow admissibility. See, e.g., State v. Wilson*, 8th Dist. No. 104333, 2017-Ohio-2980, 2017 WL 2293074, ¶ 33 ("The same reliability challenge to expert cellular phone analysis testimony presently raised by [the defendant] has been rejected under both federal and Ohio law."); *State v. White*, 2d Dist., 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 28-29

(listing cases and concluding that "cell-site analysis testimony * * * is

reliable").

10th Dist. Franklin No. 16AP-826, 2019-Ohio-358, 121 N.E.3d 412, ¶44-¶45 (emphasis

added).  *Accord,  People v. Fountain,* 2106 II App. (1st) 131474, 407 Ill. Dec. 185, 62

N.E.3d 1107(2016), ¶58; *State v. Baker,* 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-

7023, ¶37; *United States v. Jones*, 918 F.Supp.2d 1, 5 (D.D.C.2013) (collecting cases

that conclude that historical cell site analysis is neither untested nor unestablished);

*United States v. Rosario*, No. 09–CR–415–2, 2014 WL 6076364, at *2–3 (S.D.N.Y. Nov.

14, 2014) (concluding that an FBI Special Agent's cell-site analysis testimony was based

on techniques sufficiently reliable to be admitted under Federal Rule of Evidence 702

(Fed. R. Evid. 702)).

{¶97}  Johnson's reliance on *United States v. Evans*, claiming that historical cell

site analysis is a new methodology for purposes of *Daubert* is neither controlling nor

persuasive.  [Appellant's brief at 27; 30].  In *Evans*, a cell site expert used a "granulization

theory" to estimate the location from which several of the defendant's phone calls had

originated.  *Evans*, 892 F.Supp.2d at 952–56.  No such "granulization theory" testimony

was presented in Johnson's case.

{¶98}  We conclude that historical cell-site analysis is accurate enough and well

accepted enough to allow admissibility pursuant to Evid. R. 702 and *Daubert.*

*Authentication*

{¶99}  In the case at bar, the cell phone records from Verizon, Sprint and Agent

Kunkle's report were all admitted into evidence.  State's Exhibit 21, 22 and 23. 4T. at 471;

475.  Johnson contends that the trial court erred by admitting cell phone records when

those records were not authenticated as business records in accordance with Evidence Rule 803(6).  [Appellant's brief at 35-37].

**{¶100}** The Supreme Court of Ohio has examined the interplay of authentication, hearsay and the Confrontation Clause, and held that the failure to properly authenticate business records can have the effect of admitting testimonial hearsay that would violate the defendant's confrontation rights.  In *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, the court concluded that a police officer's analysis of location data based on cell tower pings was inadmissible under both the Ohio Rules of Evidence and the Confrontation Clause, because the records were admitted at trial without proper authentication by "a custodian of the record or by any other qualified witness."  Id. at ¶ 40.  The court held:

> [T]he cell-phone records in this case were not authenticated as business records, and that fact affects their status in regard to the Confrontation Clause.  If the records had been authenticated, we could be sure that they were not testimonial, that is, that they were not prepared for use at trial.  *Without knowing that they were prepared in the ordinary course of a business, among the other requirements of Evid.R. 803(6),* we cannot determine that they are nontestimonial.  We thus find that the admission of the records in this case was constitutional error.

(Emphasis added.)  Id. at ¶ 42.  *See, State v. Lawson,* 10th Dist. Franklin No. 19AP-68, 2020-Ohio-3008, 154 N.E.3d 658, ¶21.

*Custodian of the Record or Any Other Qualified Witness under Evid.R. 803(6)*

{¶101} A "qualified witness" for purposes of Evid.R.803(6) would be someone with "enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business." *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶40, *quoting* 5 McLaughlin, Weinstein's Federal Evidence, Section 803.08[8][a] (2d Ed.2009); *United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir.2003). All that is required is the witness be familiar with the record keeping system. *Sells v. Miles Homes of Ohio, Inc.,* 5th Dist. Fairfield No. 18-CA-89, 1990 WL 78866 (May 25, 1990) at *2, citing, *United States v. Hathaway*, 798 F.2d 902 (6th Cir. 1986).

{¶102} In *United States v. Hathaway*, the court noted,

[T]here is no reason why a proper foundation for application of Rule 803(6) cannot be laid, in part or in whole, by the testimony of a government agent or other person outside the organization whose records are sought to be admitted. When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system. *See Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1061 (1st Cir.1985); *Wables*, 731 F.2d at 449; NLRB *v. First Termite Control Co.*, 646 F.2d 424, 427 (9th Cir.1981); *Elizarraras v. Bank of El Paso*, 631 F.2d 366 (5th Cir.1980); Reese, 568 F.2d at 1252; 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(6)[02], at 803–178 (1985) ( "The phrase 'other qualified witness' should be given the broadest interpretation; he need not be an employee of the entity so long as he understands the system.").

798 F.2d 902, 906(6th Cir. 1986).  Thus, courts have held that a government agent may provide a foundation where the agent is familiar with the record-keeping system.  *See, e.g., United States v. Franco*, 874 F.2d 1136, 1139–40 (7th Cir.1989); *United States v. Pelullo,* 964 F.2d 193, 201(3rd Cir. 1992); *Dyno Const. Co. v. McWane, Inc.* 198 F.3d 567, 576(6th Cir. 1999); *United States v. Gordon*, D. Maine No. 1:19-cr-00007-JAW, 2019 WL 430046 (Sept. 11, 2019), *3.

{¶103} In *Hood*, the Ohio Supreme Court noted that the detective who compiled the map using cell phone location data "did not have any expertise in cell phones or towers.  He admitted being unaware that different towers have different powers, and admitted that phone company experts could provide maps and charts showing which towers serve which areas." 135 Ohio St.3d 137, 2012-Ohio-6208, ¶26.

{¶104} By contrast, in the case at bar, Agent Kunkle testified he is a member of the FBI's 80-member Cellular Analysis and Survey Team (CAST).  2T. at 294; 296.  CAST is

> [A] group of specially trained agents and task force officers who specialize in historical record analysis as it pertains to cell phones.  And that's determining the general locations of where phones were when communications were made or received on those phones.

2T. at 294.  Agent Kunkle testified that he has been involved with cell phone analysis since 2009 and has received over 400 hours of classroom and on-the-job training in historical record analysis for cell phones.  Id.  Agent Kunkle took part in a four-week course taught by professionals, such as engineers, in the cell phone communications industry, including all the major network service providers.  Id.  Agent Kunkle was certified to become a member of the CAST team.  Id. at 295-296.  Agent Kunkle also trains other

law enforcement officers in basic cell phone record analysis. 2T. at 296. Agent Kunkle estimated that he has performed thousands of historical record analysis's as it pertains to cell phones. 2T. at 296-297. He has also testified as an expert witness in Stark County. Id.

{¶105} Agent Kunkle testified that he is familiar with Verizon and Sprint's record keeping process. 2T. at 299. The data collected contains the phone numbers involved, the date and time that the communications occurred and how long it lasted. Id. The data also includes the cell phone tower used and in some cases the side of the tower that was used by the phone. 2T. at 299-300.

{¶106} Agent Kunkle testified he examined the records that phones generate based on their use and determines the general location of where those communications are happening. Those records document which cell towers—and more specifically, which sides of those towers—are being used. 2T. at 301-302; 304-306. Agent Kunkle testified concerning how call detail records are created. 2T. at 307-308. Records can only show where the phone was located and cannot identify who had the phone. Moreover, those records can identify only the general area where the phone was located—within several square miles. He described the technique as accurate but imprecise. 2T. at 310-312.

{¶107} We find that Agent Kunkle is sufficiently familiar with the record-keeping system of Verizon and Sprint to be a qualified witness for purposes of Evid.R. 803(6).

{¶108} Accordingly, the records were authenticated as business records, and therefore admissible.

{¶109} Johnson's Fifth Assignment of Error is overruled.

VI.

{¶110} In his Sixth Assignment of Error, Johnson argues the trial court abused its discretion by allowing testimony that Johnson had been shot in the leg several years ago. Johnson contends that this information was unduly prejudicial and irrelevant.

**Standard of Appellate Review**

{¶111} [A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "However, we review de novo evidentiary rulings that implicate the Confrontation Clause. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010)." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶97.

{¶112} We note that any error will be deemed harmless if it did not affect the accused's "substantial rights." Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**Issue for appellate review**: *Whether the trial court abused its discretion by admitting evidence of Johnson being shot in the leg in an unrelated incident.*

{¶113} In *State v. Crotts*, the Ohio Supreme Court explained,

As a legal term, "prejudice" is simply "[d]amage or detriment to one's legal rights or claims." Black's Law Dictionary (8th Ed.1999) 1218. Thus, it is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all

prejudicial evidence—to do so would make reaching any result extremely difficult. Rather, only evidence that is unfairly prejudicial is excludable.

"'Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.'" *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169, 172, 743 N.E.2d 890, *quoting* Weissenberger's Ohio Evidence (2000) 85–87, Section 403.3.

104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23-24.

**{¶114}** We note that the evidence was referred to during the testimony of Richard Bennett. The prosecutor introduced the evidence to bolster his testimony that he had spoken to Johnson while the two shared a cell and Johnson in fact told him things of a personal nature. 2T. at 276-277; 289-290. The defense suggested that Bennett was testifying in order to receive reward money. 2T. at 284. The defense further suggested that Bennett had obtained information concerning the suspects in the case from television and Detective Volpe. Id. at 284-285. Therefore, the testimony was admitted for a legitimate purpose of negating the defense claims that Bennett did not learn the facts

underlying the shooting from Johnson.  Further, the testimony was limited and did not delve into the circumstances of the prior shooting.

{¶115} In the alternative, we conclude, from a review of the entire record, that any error in the admission of the evidence would be "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).  We find nothing in the record to suggest that the jury abandoned their oaths, their integrity or the trial court's instructions and found Johnson guilty based upon the testimony that Johnson had been shot in the leg several years before the shooting in this case.

{¶116} Johnson's Sixth Assignment of Error is overruled.

## VII. & VIII.

{¶117} In his Seventh Assignment of Error, Johnson contends that his convictions are against the manifest weight of the evidence.  In his Eighth Assignment of Error Johnson argues that there is insufficient evidence to support his convictions.

{¶118} Johnson does not cite the specific elements of the crimes for which he was indicted that he contends the state failed to prove beyond a reasonable doubt.  According to App. R. 12(A)(2), "The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App. R. 16(A)."

{¶119} In the interest of justice, we shall attempt to address Johnson's Seventh and Eighth Assignments of Error.

**Standard of Appellate Review– Sufficiency of the Evidence.**

{¶120} The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 577 U.S. 92, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

{¶121} When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997)*; *Walker*, 150 Ohio St.3d at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney*, 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001),

*quoting Jenks* at paragraph two of the syllabus; *Walker* 150 Ohio St.3d at ¶31.  We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'"  *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

**Issue for appellate review**:  *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average mind that Johnson was guilty beyond a reasonable doubt*

{¶122} The following facts are beyond dispute.  19-month-old Child 2 died as a result of being shot three times.  Child 3 was also shot, but recovered.  Also, in the house at the time of the shooting was Harvey, Lucas, D.P., C.L. and Child 1.

{¶123} In *State v. Jester*, 32 Ohio St.3d 147, 152, 512 N.E.2d 962, 968 (1987), the Ohio Supreme Court held:

> Where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended.  Such evidence is sufficient to allow a jury to find a purposeful intent to kill.  *State v. Clark* (1978), 55 Ohio St.2d 257, 9 O.O.3d 257, 379 N.E.2d 597, syllabus; *State v. Johnson* (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637.

*Accord, State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025 (1982) (finding purpose to kill in passenger's firing gun at individual from moving vehicle); *State v. Dunlap*, 73 Ohio St.3d 308, 316, 652 N.E.2d 988 (1995), *certiorari denied* (1996), 516 U.S. 1096, 116 S.Ct.

822, 133 L.Ed.2d 765.  *State v. Banks*, 10th Dist. No. 01AP–1179, 2002-Ohio-3341, 2002 WL 1379943, at ¶ 24.

> The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death.  *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus; *State v. Edwards* (1985), 26 Ohio App.3d 199, 200, 499 N.E.2d 352.  Here, defendant looked at a group of individuals, pointed a semi-automatic handgun in their direction, and fired five shots.  In so doing, one of the bullets fired from the handgun struck and killed his driver, Andre J. Bender.  Although defendant claims the evidence equally supports a conclusion that he was merely trying to scare individuals in the group by firing the handgun into the air, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence."  *State v. Brown* (Feb. 29, 1996), Cuyahoga App. No. 68761 [1996 WL 86627], unreported.  *Compare  State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962 (when an inherently dangerous instrumentality is employed in the commission of a robbery, such evidence permits a jury to find a purposeful intent to kill).

*State v. Turner*, 10th Dist. No. 97APA05–709, 1997 WL 798770 (Dec. 30, 1997), *quoting State v. Brown*, 8th Dist. No. 68761, 1996 WL 86627 (Feb. 29, 1996) *dismissed, appeal not allowed,* 77 Ohio St.3d 1468, 673 N.E.2d 135.

{¶124} In the case at bar evidence was presented that three individuals all fired into the home in the early morning hours of July 22, 2020. This was not disputed at trial. Thus, Johnson's argument centers upon the evidence presented during his trial to identify him as one of the three shooters.

### *The identity of Johnson as one of the shooters*

{¶125} The state presented direct evidence that Johnson was involved in the shooting by his own statements made to his cellmates Richard Bennett and Lamar Mitchell. Photographic evidence that Johnson's car was involved was presented. Further, cell phone location data showed the movements of the cell phones of Davai Woodson and Jonas Hudson, aka "Jerk" before and after the shooting in the area of the Bexley Apartments. Johnson admitted to the police that he knew Davai and Facebook photographs showed the three knew each other. Johnson further admitted that he was at his brother Lagentrius Johnsons home at the Bexley Apartments all day and night of the shooting. Johnson changed the rims on his car sometime after the shooting. Johnson admitted to the police that Lucas had robbed his brother.

{¶126} If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "'such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.'" *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), at paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds in State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997).*

{¶127} "'Circumstantial evidence and direct evidence inherently possess the same probative value [.]'" *Jenks,* paragraph one of the syllabus. Furthermore, "'[s]ince

circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt.'" *Jenks*, at 272.  While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts.  *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293(1990), *citing Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 331, 130 N.E.2d 820 (1955).  Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case.  *Lott,* 51 Ohio St.3d at 168, 555 N.E.2d 293, *citing Hurt*, 164 Ohio St. at 331, 130 N.E.2d 820.

{¶128} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Johnson was guilty of the offenses as charged in the Indictment.

{¶129} We hold, therefore, that the state met its burden of proof and accordingly, there was sufficient evidence to support Johnson's convictions.

**Standard of Appellate Review – Manifest Weight.**

{¶130} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient.  *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

{¶131} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541(1997), *State v.*

*Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶83.   When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony.   *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652(1982) (quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶25, citing *Thompkins.*

**{¶132}** Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"   *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983).   Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."  Id.

**Issue for Appellate Review**:  *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.*

**{¶133}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'"   *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.  Based upon the foregoing and the entire record in this matter we find Johnson's convictions are not against the sufficiency or the manifest weight of the evidence.  To the contrary, the jury

appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Johnson's guilt.

{¶134} Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, we cannot reach the conclusion that the trier of facts lost its way and created a manifest miscarriage of justice. We do not find the jury erred when it found Johnson guilty of murder, felonious assault, improperly discharging a firearm at or into a habitation, and of the attendant firearm specifications as charged in the Indictment. Taken as a whole, the testimony and record contains ample evidence of Johnson's responsibility for all of the alleged crimes. The fact that the jury chose to believe the testimony of his cellmates does not, in and of itself, render his convictions against the manifest weight of the evidence. While Johnson is certainly free to argue that Bennett and Mitchell lied to implicate him in exchange for favorable treatment, and that the police threatened Hastings to implicate Johnson, on a full review of the record we cannot say that the jury clearly lost its way or created a manifest injustice by choosing to believe their testimony.

{¶135} The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. The fact that the state relied on circumstantial evidence in proving Johnson's guilt does not make his convictions any less sound.

{¶136} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Johnson was convicted.

{¶137} Johnson's Seventh and Eighth Assignments of Error are overruled.

IV.

{¶138} In his Fourth Assignment of Error, Johnson argues that the failure of his trial counsel's representation during Johnson's jury trial constituted ineffective assistance of counsel. Johnson cites counsel's representation during voir dire, failure to challenge the admission and testimony concerning cell phone location data, failure to object, and to request a jury instruction, concerning gang involvement, and the state's use of leading questions during its case in chief.

**Standard of Appellate Review**

{¶139} "To prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 694 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." Id., at 688, 104 S.Ct. 2052. In addition, to establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. *Andtus v. Texas,* 590 U.S. ___, 140 S.Ct. 1875, 1881, 207 L.Ed.2d 335 (June 15, 2020).

**Issue for appellate review**: *Whether there is a reasonable probability that, but for counsel's failures, the jury would have found Johnson not guilty*

*Counsel's failure to strike Juror No. 21, either by moving to strike for cause or exercising a preemptory challenge*

{¶140} During voir dire, Juror No. 21 recalled that she had seen an article about the case in the newspaper. 1T. at 48. The trial judge then asked the juror if based upon

what the juror heard about the case, if the juror felt that she already made up her mind about the guilt or innocence of the Defendant.  Id. Juror No. 21 responded, "Well, it tugs on my heart strings, you know, the kid that got killed, that bothers me." 1T. at 49.  The court proceeded to explain the presumption of innocence and asked whether Juror No. 21 could presume Johnson was not guilty.  Id.  Juror No. 21 replied, "Right, I can do my best.  I mean I just keep thinking about the kid, you know, but I can try to be as fair as I can be." Id.  When asked if she could reach a decision based upon the evidence without regard to anything Juror No. 21 may have heard or read, the juror responded "Yes." 1T. at 50; 51. Subsequently, after reminding the juror that the state has the burden of proof beyond a reasonable doubt, the state inquired of Juror No. 21,

[Prosecutor]: And just because we have a victim that tugs at your heart strings doesn't decrease that burden, you still have to hold the State of Ohio to proof beyond a reasonable doubt?

Juror No. 21: Right.

[Prosecutor]: Can you promise us you can do that?

Juror No. 21: Yeah, I can do it, yeah.

[Prosecutor]: And not say, well, it's a young child so I'm not going to follow the Court's instructions?

Juror No. 21: Right.

[Prosecutor]" You're going to follow the Court's instructions, correct?

Juror No. 21: Yes.

1T. at 51-52.  In *State v. Mundt,* the Ohio Supreme Court noted,

"Jurors need not be totally ignorant of the facts and issues involved in the case. * * * '[I]t is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint; such a standard would be certainly unsalutary, and likewise impossible to achieve.'" *Miller v. Francis*, 269 F.3d at 616, *quoting DeLisle v. Rivers* (C.A.6, 1998), 161 F.3d 370, 382.

115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶70.

{¶141} When a defendant bases an ineffective-assistance of counsel claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant "*must* show that the juror was actually biased against him." *State v. Kirkland,* 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶80 (emphasis in original); *State v. Mundt,* 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶67; *State v. Bates,* 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶25. In *Bates,* the Ohio Supreme Court instructed that,

Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997), *citing United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). In sum, Bates must prove that at least one of the jurors at his trial, because of the juror's partiality or biases, was not "capable and willing to decide the case solely on the evidence" before that juror. *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

Actual bias can be found from a juror's express admission or from circumstantial evidence of the juror's biased attitudes. *Hughes* at 459. For example, courts have found actual bias when a juror unequivocally stated that she could not be fair due to law-enforcement bias, id. at 459-460, when a juror had a fixed opinion of the defendant's guilt based on pretrial publicity, *Irvin v. Dowd*, 366 U.S. 717, 727-728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), or when a juror expressed views on the death penalty that "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,'" *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), *quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶25-¶26.

**{¶142}** The record does not establish that Juror No. 21 harbored any bias toward Johnson. Juror No. 21 never stated that she could not be fair. To the contrary, the juror's responses indicated that she would be an open-minded juror. The only issue Juror No. 21 expressed was the emotional difficulty of hearing a case involving the death of a child, not a bias against Johnson. Accordingly, Johnson has not established actual bias or that he suffered prejudice because his attorney allowed Juror No. 21 to be seated as a juror.

**{¶143}** In this case, we can find neither deficient performance by counsel nor a reasonable probability that the result would have been different but for counsel's alleged errors. Accordingly, we reject Johnson's claim of ineffective assistance with respect to prospective Juror No. 21.

*Cell phone records and testimony*

**{¶144}** Johnson next argues that his trial counsel was ineffective in failing to challenge the cell phone records, the testimony of Agent Jacob Kunkle, and his historical cell phone analysis report.

**{¶145}** As we have found in our disposition of Johnson's Fifth Assignment of Error, the cell phone records, the report and the testimony of Agent Kunkle were properly admitted by the trial court.

**{¶146}** Accordingly, we reject Johnson's claim of ineffective assistance with respect to the cell phone evidence.

*References to gang affiliation*

**{¶147}** Johnson next contends that "numerous instances of improper gang evidence was presented to the jury." [Appellant's brief at 33]. Johnson contends that his trial counsel failed to object to this evidence and failed to ask the trial judge for a limiting instruction.

**{¶148}** "'The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel.'" *State v. Fears,* 86 Ohio St.3d 329, 347, 715 N.E.2d 136 (1999), *quoting State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831(1988). *Accord, State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶233. A defendant must also show that he was materially prejudiced by the failure to object. *Holloway*, 38 Ohio St.3d at 244, 527 N.E.2d 831.

**{¶149}** Richard Bennett, Johnson's cellmate, testified that Johnson told him that "two family members" committed the shooting with him. 2T. at 274. Johnson further told

Bennett that the two individuals were from Chicago and were members of "The Black Gangster Disciples." Id.

{¶150} Lamar Mitchell also a cellmate of Johnson testified that Johnson's brother had been robbed. 3T. at 358-359. Mitchell testified that Johnson told him "[s]ome dude from Chicago basically was like, you know, let's go and get the dude or whatever…." Id. at 359. Mitchell further testified that Johnson told him, that "Trejuan, J. Milli, some guy from Chicago, [and] somebody named Jerky" were involved in the shooting. 3T. at 359-360.

{¶151} Detective Volpe testified that during the course of his investigation of the shooting, he was able to identify "J. Milli" as Jamal Smith. 4T. at 413. Detective Volpe further discovered that Smith was from the Chicago area. Id. Over defense counsel's objection, Detective Volpe testified that he contacted the Chicago Police Department and the Chicago FBI and was advised that Jerk and J. Milli were affiliated with the Black Gangster Disciples. 4T. at 414.

{¶152} As Johnson's trial counsel did object to Detective Volpe's testimony concerning the gang affiliation of Jerk and J. Milli he was clearly not ineffective with respect to Detective Volpe's testimony.

{¶153} In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, the Ohio Supreme Court set forth a three-part analysis for determining the admissibility of other-acts evidence: to be admissible, (1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be

substantially outweighed by the danger of unfair prejudice, Evid.R. 403. Id. at ¶20. The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. The court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose. *Hartman* at ¶ 22, *citing Williams* at ¶ 17.

{¶154} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime. Other-acts evidence may, however, be admissible for another non-character-based purpose, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.'" *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 36, *quoting* Evid.R. 404(B). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman,* 161 Ohio St.3d 214, ¶22. The other acts evidence "is admissible when the evidence is probative of a separate, nonpropensity-based issue." Id.

{¶155} In two recently decided cases, the Ohio Supreme Court "provided a guide for courts to evaluate proposed other-acts evidence to determine whether the evidence connects to a permissible purpose without relying on any improper character references." *Smith* at ¶ 37. *See also Hartman* at ¶ 19. The first question, or the threshold question, that a court must ask itself is whether the other-acts evidence is relevant. Id. at ¶ 24; *Smith* at ¶ 37. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "In the Evid.R. 404(B)

context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is actually in dispute." *Smith* at ¶ 37, *citing Hartman* at ¶ 26-27.

{¶156} "If the evidence is not premised on improper character inferences and is probative of an issue in the case," the court moves on to the next step of the analysis. Id. at ¶ 38. The court must then consider "whether the evidence's value 'is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.'" Id., *quoting* Evid.R. 403(A). *See also Hartman* at ¶ 29. As other-acts evidence "'almost always carries some risk that the jury will draw the forbidden propensity inference,' courts should be vigilant in balancing the prejudicial impact of the evidence against its probative value." *Smith* at ¶ 38, *quoting Hartman* at ¶ 33. *See also United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014).

{¶157} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) [for a nonpropensity-based issue] is a question of law." *Hartman* at ¶ 22. However, a trial court's determination that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice is an "issue that involves an exercise of judgment" and "should be reviewed for an abuse of discretion." Id. at ¶ 30.

{¶158} The Ohio Supreme Court has held that evidence of a defendant's gang affiliation is admissible pursuant to Ohio Evidence Rule 404(B) to show motive. *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150. This is particularly the case where "the interrelationship between people is a central issue." Id. at ¶170, *quoting United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999).

**{¶159}** In the case at bar, the evidence was admissible to demonstrate Johnson's motive in committing the shooting. "Motive evidence establishes that the accused had a specific reason to commit a crime." *State v. Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 48. "There need be no similarity between the other-acts evidence and the crime charged under a motive theory; 'a dissimilar prior act is just as feasible in supplying a motive for committing a crime as is a similar prior act.'" Id*., quoting* Weissenberger, Federal Evidence, Section 404:16 (7th Ed.2019).

**{¶160}** Lucas had robbed several gang members and drug dealers, including Johnson's brother. Johnson told his two cellmates the crime was in retaliation for Lucas robbing his brother. He further told the cellmates who else was involved in the crime. Evidence of a defendant's gang membership can provide "context, motive, and set-up of the crime and * * * 'make the actions of the participants understandable to the jurors.'" *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 76, *quoting State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 113.

**{¶161}** In the case at bar, Johnson's affiliation with J. Milli, Jerk and their affiliation with the Black Gangster Disciples was relevant to explain why three masked individuals opened fire with three different handguns on Lucas's home in the early morning hours of July 22, 2020.

**{¶162}** We therefore find that, as a matter of law, the gang affiliation other-acts evidence was admissible for the non-propensity-based purpose of demonstrating motive and the interrelationship of the parties.

**{¶163}** Trial courts must treat evidence of gang affiliation with care since most jurors are likely to look unfavorably upon a defendant's membership in a street gang.

*See, United States v. Jobson*, 102 F.3d 214, 219 n. 4 (6th Cir.1996).   In addition to relevancy, Evid.R. 403 requires a court to weigh the probative value of the evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury and to exclude evidence more prejudicial than probative.   When considering evidence under Evid.R. 403, the trial court is vested with broad discretion.   *See State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 40.

{¶164} In the case at bar, the evidence of gang membership was limited.   We note that neither Bennett nor Mitchell testified that Johnson himself was a gang member.   No evidence of any other crimes or criminal activity of the Black Gangster Disciples was presented to the jury.

{¶165} In light of the relevance of J. Milli and Jerk's gang affiliation and the state's minimal use of that evidence, the danger of unfair prejudice did not substantially outweigh the probative value of the gang evidence.   *See Bethel* at ¶ 173.   Accordingly, we find that the trial court did not abuse its discretion in admitting the Evid.R. 404(B) evidence.

{¶166} Therefore, we reject Johnson's claim of ineffective assistance of counsel with respect to the gang affiliation testimony.

### *Prosecutor's use of leading questions*

{¶167} Johnson next argues that the prosecutor's use of leading questions, which was not objected to by his trial counsel, was unfairly prejudicial.

{¶168} "A leading question 'instructs [the] witness how to answer or puts into his mouth words to be echoed back."   *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616, N.E.2d 909 (1993), *quoting* Black's Law Dictionary (6 Ed.1990) 888.

{¶169} Evid.R. 611(C) provides that,

Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

**{¶170}** "While Evid.R. 611(C) limits the use of leading questions during direct examination, there is no absolute prohibition to these types of questions.  It is within the discretion of the trial court to allow leading questions on direct examination, for instance, if the question is used to review previously elicited answers."  *State v. Villani,* 12th Dist. Butler No. CA2018-04-080, 2019-Ohio-1831, ¶19, *citing State v. Thomas*, 12th Dist. Warren No. CA2010-10-099, 2012-Ohio-2430, ¶ 50.

**{¶171}** Courts have observed that "if defense counsel had objected to any potentially leading questions, 'the state could have simply rephrased" the questions following the objection.  *State v. McCleery,* 11th Dist. Trumbull No. 2021-T-0024, 2022-Ohio-263, ¶ 37, *quoting State v. Jones,* 10th Dist. Franklin No. 18AP-33, 2019-Ohio-2134, 137 N.E.2d 661, ¶ 60.

**{¶172}** Because Johnson does not cite specifically to any leading question in the transcript that rendered the trial fundamentally unfair or effected his substantial rights, Johnson has failed in his burden to demonstrate that, but for his trial attorney's failure to object to the state's use of leading questions, the jury would have found him not guilty. *Andtus v. Texas,* 590 U.S. __, 140 S.Ct. 1875, 1881, 207 L.Ed.2d 335 (June 15, 2020).

**{¶173}** Johnson's Fourth Assignment of Error is overruled.

IX.

{¶174} In his Ninth Assignment of Error, Johnson argues he was denied a fair trial when the cumulative errors as set forth in his preceding Assignments of Error are considered together.

**Standard of Appellate Review**

{¶175} In *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, the Supreme Court of Ohio recognized the doctrine of cumulative error.  Under the doctrine of cumulative error, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together."  *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 40, *citing State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000).  "In order to find cumulative error, we first must find that multiple errors were committed at trial."  Id.

**Issue for appellate review**: *Whether multiple errors occurred during Johnson's jury trial which, when considered together, violated Johnson's right to a fair trial*

{¶176} In the instant case, we do not find multiple instances of harmless error triggering the cumulative-error doctrine.  Where we have found that the trial court did not err, cumulative error is simply inapplicable.  *State v. Carter*, 5th Dist. Stark No. 2002CA00125, 2003-Ohio-1313, ¶ 37.  To the extent that we have found in this case that claimed error did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict.  *State v. Leonard*, 104 Ohio St.3d 54, 818 N.E.2d 229, 2004-Ohio-6235, ¶ 185.

{¶177} Johnson's Ninth Assignment of Error is overruled.

{¶178} The judgment of the Stark County Court of Common Pleas is affirmed.


By Gwin, J.,

Wise, Earle, P.J., and

Delaney, J., concur